UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

| | | |
|---|---|---|
| IN RE: | : | CHAPTER 11 |
| | : | |
| EVOSHIELD, LLC, | : | CASE NO. 16-31159 |
| | : | |
| Debtor. | : | JUDGE SMITH |
| | : | |

**RESPONSE OF DUGOUT VENTURES, LLC TO EVOSHIELD, LLC'S EMERGENCY MOTION FOR ENTRY OF ORDER APPROVING SALE OF SUBSTANTIALLY ALL THE ASSETS OF THE PUTATIVE DEBTOR UNDER SECTIONS 303 AND 363 OF THE BANKRUPTCY CODE**

Dugout Ventures, LLC ("DV"), the senior secured creditor of the putative debtor, Evoshield, LLC (the "Debtor" or "EvoShield"), hereby submits its Response to the Emergency Motion for Entry of Order Approving Sale of Substantially All the Assets of the Putative Debtor Under Sections 303 and 363 of the Bankruptcy Code [Doc. No. 8][1] (the "Motion") filed by the Debtor on November 7, 2016, as follows:

**PRELIMINARY STATEMENT**

As a preliminary matter, it is not clear whether a sale pursuant to § 363 of the Bankruptcy Code is permitted during the "gap period" between the petition date and the order for relief in an involuntary case. DV believes that a § 363 sale is premature at this juncture, as the Debtor has not been adjudicated a debtor-in-possession, schedules of assets and liabilities have yet to be filed, and a § 341(a) meeting of creditors has yet to be held. The procedural irregularity of a § 363 motion being filed just days into an involuntary case, and before schedules have been filed creates, among other things, due process issues. All creditors of the Debtor need to receive notice of a § 363 sale, pursuant to Fed. R. Bankr. P. 2002(a)(2). Thus, the Motion, as currently noticed, does not comply

---

[1] On November 7, 2016, the Motion was amended to include the electronic signature of counsel [Doc. No. 11].

with the Federal Rules of Bankruptcy Procedure.

## INTRODUCTION

DV is both the sole secured creditor of the Debtor as well as a previous bidder for the Debtor's assets. As a result of DV's dual role, DV's position necessarily is two-fold. As DV's lien will be paid in full by the proposed sale of substantially all of the Debtor's assets to Wilson Sporting Goods Co. ("Wilson"), as described more fully in the Motion (the "Wilson Sale"), DV understands that it may have little basis to object to the Proposed Sale as a secured creditor.

However, the exigency presented in the Motion – that the Debtor will run out of cash to operate its business is not accurate, as indicated in the Declaration of Mark Walker ("Walker Declaration"), attached hereto and incorporated herein as Exhibit A. Not only is the company cash flow expected to be positive over the next few months, but DV is also willing to (i) extend the maturity date of its loan to the Debtor beyond November 15, 2016; (ii) permit the Debtor's use of cash collateral to the extent necessary, subject to the filing of proper documentation with the Court and Court approval; and (iii) provide debtor-in-possession financing to the Debtor as needed to continue its operations until a sale of its assets can be consummated under this Court's supervision, and with this Court's approval (on terms to be negotiated and subject to this Court's approval).

As such, DV opposes the Motion on a limited basis, and asks that this Court continue the hearing on the Motion to allow for a robust and complete § 363 sale process, including the solicitation and acceptance of overbids.

## FACTUAL BACKGROUND

1. As set forth in the Walker Declaration, DV previously made a contingent bid to acquire Evoshield during the initial process that Evoshield conducted to solicit equity investments in Evoshield. DV's bid was accepted by Evoshield, and memorialized in a purchase agreement executed on June 27, 2016 ("Original Purchase Agreement"). The Original Purchase Agreement was contingent upon a merger with another company in which DV or its affiliates owned an equity interest.

2. After extending a bridge loan to Evoshield and acquiring the senior debt from Wells Fargo, DV agreed to restructure all of the senior debt and extend up to $5,000,000 of total financing to Evoshield for a short period of time to attempt to complete the merger.

3. However, upon realizing that the merger was not likely, DV promptly gave Evoshield notice on September 12, 2016, that it was unlikely that DV would be able to effectuate the merger by October 14, 2016. DV requested that Evoshield again attempt to sell its assets.

4. DV's decision to allow Evoshield to run its own sale process was made in the hopes of obtaining bids maximizing the value of Evoshield, not only so that DV's liens would be paid, but also to protect the interests of the remaining creditors and shareholders of Evoshield, with whom DV had developed relationships.

5. During the sale process, DV submitted an initial bid on October 21, 2016. DV's initial bid allowed current creditors and shareholders the opportunity to participate in Evoshield moving forward, but also provided equal treatment among all unsecured creditors.

6. On October 24, 2016, Consensus verbally requested clarification of DV's initial bid. In response, DV sent two follow-up e-mails, which made various clarifications and increases to the initial bid. DV's bid, as amended, offered stock to subordinate note holders and proposed to pay all unsecured creditors equally. In addition, DV also conveyed its intent to offer additional consideration to a limited number of shareholders of Evoshield in the form of company warrants in the amount of $1,000,000.

7. Thereafter, DV learned from Mr. O'Hara that he thought Evoshield had signed another bid.

## LIMITED OPPOSITION TO THE MOTION

8. What the Motion fails to convey is that the Wilson bid proposes to pay certain unsecured creditors (including certain trade creditors) 100 cents on the dollar, while paying other similarly-situated unsecured creditors potentially as low as 20 cents on the dollar. This proposal is patently unfair, and flies in the face of the Bankruptcy Code's principles, including ratable distribution to similarly-situated creditors.

9. In comparing the two the Wilson bid to the DV amended bids, the total consideration to Evoshield from DV's amended bids was more in both cases than the Wilson bid, largely because of the warrants offered to Evoshield shareholders and the stock offered to subordinated debt holders. However, as Michael O'Hara stated in his Declaration, filed concurrently with the Motion, there were contingencies to DV's bid. Notably, these contingencies were an attempt by DV to provide a fair distribution of net proceeds to unsecured creditors rather than disproportionately allocating net proceeds to one class of unsecured creditors over others, as in the Wilson Sale. Based upon statements from the petitioning creditors' counsel at the telephonic hearing held November 7, 2016, the disproportionate treatment of general unsecured creditors and the overall return to unsecured creditors appear to have been significant reasons for their filing this involuntary petition.

10. As is evident from DV's numerous bids for the assets of Evoshield, DV was and is still interested in acquiring Evoshield. DV remains interested in purchasing the Debtor's assets and believes it can do so in a manner that will maximize the value for creditors and shareholders of Evoshield with whom DV has developed relationships.

11. Any intimations that DV was a disgruntled bidder and somehow interfered with the Wilson Sale are untrue.

12. As set forth above, DV's prepetition bid consisted of stock and cash, based on DV's understanding at the time that certain creditors, including the Petitioning Creditors herein, preferred stock in the new company going forward. Other creditors, such as trade creditors, preferred to receive cash in payment of their claims. If given the opportunity to bid on Evoshield's assets during this bankruptcy case, DV would be amenable to honoring its previous bids.

13. DV further responds to certain allegations in the Motion as follows:

    a. Evoshield's allegation in ¶ 13 of the Motion that "EvoShield received no offers other than the Wilson APA that contained any cash payment to unsecured creditors," is incorrect. In fact, DV's initial bid explicitly offered $1,500,000 in cash ($600,000

-4-

towards transaction costs and $900,000 to unsecured creditors).

        b.        Evoshield's allegation in ¶ 5 of the Motion that, "The closing date was delayed, in part, because [DV] did not provide a payoff letter and raised issues about a prepayment penalty that was clearly not due, but the parties were prepared to close in escrow regardless of such lack of," is misleading, at best. DV did, in fact, provide a payoff quote to Evoshield with its bid on October 21, 2016, for a closing anticipated on October 31, 2016. However, this payoff quote included a prepayment fee, which was later disputed by Evoshield. Nonetheless, with this payoff quote already provided, Evoshield had all the information it needed to pay off DV's loan. Subsequently, Evoshield raised additional issues with respect to wiring instructions, and Evoshield apparently disputed other amounts in the payoff quote. However, DV was not informed of these issues until the day before the scheduled closing of the Wilson Sale. Thus, the allegation that DV delayed the closing of the Wilson Sale is patently false.

        c.        Evoshield's allegations in ¶ 8 of the Motion that, "In addition to the risk that the assets will bring less if the sale is delayed, EvoShield risks running out of operating cash should it be forced to operate much longer. [DV] extended additional funding to EvoShield beginning in August 2016. EvoShield has exhausted the additional funding and currently has approximately $191,000 of available cash," and "EvoShield's operating cash flow is negative," are also misleading and inconsequential. As stated above, DV is willing to extend additional financing to Evoshield, as needed for Evoshield's continued operations as a debtor in possession. Moreover, it appears that the company may not even need this additional cash injection for some time.

## CONCLUSION

DV believes that a robust § 363 sale process, with notice to all creditors after the entry of an order for relief, would bring optimum value to all creditors and shareholders of Evoshield, which is the objective of Chapter 11.  For the foregoing reasons, DV respectfully requests that this Court deny the Motion without prejudice to the Debtor's filing a new § 363 sale motion that allows for overbids and a complete § 363 sale process.

Dated:  November 11, 2016

Respectfully submitted,

RUTAN & TUCKER, LLP


By: */s/ Caroline R. Djang*
William F. Meehan (CA State Bar No. 241293)[2]
wmeehan@rutan.com
Caroline R. Djang (CA State Bar No. 216313)[3]
cdjang@rutan.com
RUTAN & TUCKER, LLP
611 Anton Boulevard, Suite 1400
Costa Mesa, California 92626-1931
Telephone:     714-641-5100
Facsimile:     714-546-9035

 - and -


By: */s/ Eric W. Anderson*
Eric W. Anderson (GA Bar No. 016810)
eanderson@phrd.com
PARKER HUDSON RAINER & DOBBS LLP
303 Peachtree Street, NE
Suite 3600
Atlanta, Georgia 30303
Telephone:     404-420-4331
Facsimile:     678-533-7721

*Attorneys for Secured Creditor
Dugout Ventures, LLC*

---

[2] *Pro hac vice* application is pending.
[3] *Pro hac vice* application is pending.

# **EXHIBIT A**

# **DECLARATION OF MARK WALKER**

## DECLARATION OF MARK WALKER

1. I, Mark Walker, declare under penalty of perjury that the following is true to the best of my knowledge, information and belief.

2. I am the Managing Member of Servarius Management, LLC, the Managing Member of Dugout Ventures, LLC ("DV"), a Delaware Limited Liability Company.

3. I am a graduate of Louisiana State University and am a Certified Public Accountant licensed by the state of California, License #78057.

4. DV previously made a contingent bid to acquire Evoshield during the initial process that Evoshield conducted to solicit equity investments in Evoshield in May of 2016. DV's bid was accepted by Evoshield, and memorialized in a purchase agreement executed on June 27, 2016 ("Original Purchase Agreement"). The Original Purchase Agreement was contingent upon a merger with another company in which DV or its affiliates owned an equity interest. We were subsequently told that in this original bidding process in May, which was later confirmed in Michael O'Hara's Declaration, that the next highest bid was a $14,000,000 bid with various contingencies[1], and that Wilson made a verbal offer of approximately $7,000,000 to $8,000,000, which also seems to be confirmed in Wilson's Response where they say "Wilson received permission from its owners to bid less than $10 million for the assets of EvoShield".

5. After extending a bridge loan to Evoshield required under the Original Purchase Agreement and acquiring the senior debt from Wells Fargo after Evoshield defaulted on their

---

[1] The next highest bidder in this original process had a 30 day contingency and we were told this bidder also requested a quality of earnings report during this period. However, after we received the second quarter financials of Evoshield shortly after the execution of the Original Purchase Agreement, it was evident that the Company had overestimated its anticipated 2016 sales to all bidders by approximately $2,250,000, and so because the next highest bidder would have learned this in their quality of earnings report, it is probable that this bid would have been reduced significantly in this contingency period.

senior loan, DV agreed to restructure all of the senior debt and extend up to $5,000,000 of total financing to Evoshield for a short period of time to attempt to complete the merger.

6.  DV's exclusivity period under the Original Purchase Agreement expired as of July 31, 2016, approximately a month after the agreement was signed, and Evoshield was free thereafter to continue marketing the company to others. Until September 6, 2016, when DV entered into a new agreement with Evoshield to restructure their senior debt which had recently been acquired by DV, and among other things, agreed to allow Evoshield to run its own private sale process independent of both DV as the senior lender and the courts upon notice from DV. DV promptly gave Evoshield notice shortly therafter on September 12, 2016, that it was unlikely that DV would be able to effectuate the merger by October 14, 2016. DV requested that Evoshield attempt to sell its assets and gave them the option to do so privately without DV's intervention as the senior lender by obtaining shareholder vote. Evoshield claimed to have received this shareholder vote shortly thereafter to hold this private auction.

7.  DV's decision to allow Evoshield to run its own private sale process independent of both DV as the senior lender and the courts, and despite the knowledge that its current liabilities exceeded the next highest bid from the previous process in May,[2] was made in the hopes of allowing Consensus, the investment advisory company retained by Evoshield, to guide the company in choosing the route which had the highest probability of obtaining bids which would maximize the value of Evoshield – not only so that DV's liens would be paid, but also to protect the interests of the remaining creditors and shareholders of Evoshield, with whom DV had developed relationships. However, because this was a private sale, the only two relevant

---

[2] The total liabilities of the company per the September 30, 2016 financial statement filed are somewhere between $14,300,000 and $16,000,000.

4653647_2

- 2 -

bids were layered with contingencies and clawbacks[3] which unnessessarily complicated the sale, and potentially limited the number of bidders willing to participate.

8. During this second sale process, DV submitted an initial bid by the deadline on October 21, 2016. DV's initial bid allowed current creditors and shareholders the opportunity to participate in Evoshield moving forward, but also explicitly provided for pro-rata cash treatment among all unsecured creditors.

9. On October 24, 2016, Consensus verbally requested clarification of DV's initial bid. In response, DV sent a follow-up e-mail, which made various clarifications and increased the initial bid. DV's bid, as amended, offered $2,500,000 in Class B "Newco" stock[4] to subordinate note holders and limited the recourse on any sales tax or other contingent liabilities to $500,000 of this stock. Because of the explicit objective conveyed to Evoshield in the initial bid to provide a pro-rata distribution to all unsecured creditors, this increase in stock to subordinate note holders would have also required a proportionate increase in the amount proposed to other unsecured creditors up to the approximate amount of $1,100,000. The proposed payment to unsecured creditors was of approximately 40 cents on the dollar.

10. In addition in this bid, DV also conveyed its intent to offer a "meaningful amount" of additional consideration to a limited number of shareholders of Evoshield in the form of company warrants. DV's intent was to offer $1,000,000 of Newco warrants to certain Evoshield shareholders in addition to a pool of warrants to new company management which

---

[3] The accepted Wilson bid not only contemplates negotiating down approximately $456,000 of unsecured debt, it also leaves the remaining company with $782,000 of potential sales tax claims and another approximately $430,000 of unpaid liabilities, representing over 60 unsecured creditors which Wilson did not prefer in their bid. DV'sbid had similar contingencies placed on Evoshield.

[4] There was a cash flow preference proposed for DV's position in Newco and any new capital injected via Class A shares before the Class B shares were awarded a full catch-up, and then a pari-passu distribution thereafter

would be exercisable at a valuation after a profitability threshold for both DV and the subdebt holders of Evoshield was met.

11. After a day of silence from Consensus and Evoshield, and before DV learned that Evoshield had an executed agreement with Wilson, on October 26, 2016, DV e-mailed Consensus an increase in the previous DV bid, offering the subordinate note holders of the company $3,500,000 in Newco stock, approximately 55% of the total subordinate note holders' claims, which again would require a corresponding increase in the amount paid to other unsecured creditors as well.

12. Upon review of the Wilson final bid, the total consideration guaranteed to Evoshield from DV's October 24, 2016 bid including the warrants DV intended to offer to shareholders was approximately $1,000,000 more than the Wilson bid, and total consideration to the stakeholders of Evoshield from DV's October 26, 2016 bid was approximately $2,500,000 more guaranteed to those stakeholders; however, DV's bids admittedly were based on giving value in a new reorganized company to existing stakeholders of Evoshield rather than giving them cash at 20+ cents on the dollar as they were to get in the Wilson bid.

13. Despite the fact that both DV bids provided more consideration to the unsecured creditors of Evoshield, as Michael O'Hara stated in his Declaration filed concurrently with the Motion, there were contingencies to DV's bids: "Indeed, the DV bid looked more like the first draft of a de facto plan of reorganization proposal that would have required more time and funding than was permitted by DV's own loan documents." However, Mr. O'Hara avoids similar contingencies in the Wilson bid. And DV explicity told Mr. O'Hara in its amended bid that DV would give Evoshield this additional time by extending deadlines DV imposed as the senior lender. Also, DV believed that these contingencies were necessary because our goal,

which DV made explicitly clear to Evoshield numerous times, was to not only allow current stakeholders the opportunity to continue with Evoshield instead of selling their interest at the currently low valuation being offered by both bidders, which DV believed at the time that they all desired to do, but also provide an equal distribution of net proceeds to all unsecured creditors rather than disproportionately allocating net proceeds to one class of unsecured creditor over another. This objective was going to require time to get approval from those creditors.

14. As is evident from DV's numerous bids for the assets of Evoshield, DV was and is still interested in the future of Evoshield. With respect to Evoshield's bankruptcy, DV's goal is to maximize the value for creditors and shareholders of Evoshield with whom DV has developed relationships, while not placing a value on Newco which would make profitability difficult for all new stakeholders.

15. Any intimations that DV was a disgruntled bidder and somehow interfered with the Wilson Sale are untrue. In fact, DV has always communicated with Evoshield and exhibited through its good faith actions that DV's objective is, and always was, to have a fair, equitable transition for the creditors and shareholders of Evoshield.

16. DV further responds to certain allegations in the Wilson Response as follows:

17. Wilson's comment in ¶ 3 of their Response "Wilson received permission from its owners to bid less than $10 million for the assets of EvoShield" may in fact be true, but it also shows that Wilson perceived no decline in the value of the assets over the past five months, but rather potentially an increase in the value since their ultimate bid exceeded this amount.

18. As indicated in ¶ 4 through ¶ 7 of the Wilson Response, Walker did in fact meet with Jim Hackett, Wilson's General Manager of Baseball/Softball, at the Major League Baseball All-Star game after the original introduction made via phone between a DV player member and

Mr. Hackett about potentially entering into a licensing deal together with Evoshield. Mr. Hackett said he liked the concept of DV, and in fact had a similar idea years back, but admittedly said he was not familiar with how that would work with Wilson, as he had never done a licensing deal before. However, Mr. Hackett was interested in discussing a potential deal further. Wilson was one of a half a dozen of other potential suitors that DV was in contact with at the time (including the company that was to be involved in the merger contemplated in the Original Purchase Agreement), all of whom Evoshield was aware.

19. Very little communication occured between that conversation and October 6, 2016, when I reached out again to Mr. Hackett to see if Wilson would still be interested in the previously discussed licensing deal with DV. Mr. Hackett's indications to me at that time led me to believe that Wilson was no longer interested in such a deal.

20. On October 11, 2016, however, Mr. Hackett called me (not the reverse as is alleged by Wilson in ¶ 12 of the Wilson Response) and said Wilson was in fact now interested in entering into a licensing deal, but wanted to bring in Wilson's in-house counsel, Ray Berens, who was the one internally who was familiar with licensing deals. During that call with Mr. Hackett and Mr. Berens, Mr. Berens attempted to convince DV that a normal profit margin was around 10% for companies like this, and so a typical licensing deal would need to take that into consideration and figure out how to split that net profit. I made an argument about the cost efficiencies they were going to capture, but they rejected that argument because of the internal structure of Wilson. On that call, I told Mr. Berens and Mr. Hackett that I would put a term sheet together, but after internal conversations at DV, DV decided not to propose terms to Wilson.

21. It was not until October 20, 2016 that I called Mr. Hackett back to let him know that DV had decided internally that DV was not going to provide Wilson a licensing term sheet at that time.

22. Wilson's comment in ¶ 15 of their Response that "Wilson therefore saw that Dugout had imposed strict requirements regarding the Auction process, and that Wilson had to get busy to meet the strictures of the process," is misleading. To clarify, DV relied on advice from Consensus as a "management consultant in multiple retail and consumer products Chapter 11 and Chapter 7 cases" that "31 days was one day too long to sell the company." Consensus insisted on a 30-day auction process. Despite this advice, DV offered 39 days to obtain the final bids, and then another 10 days to close, on the advice of Consensus, Evoshield's advisor.

23. Wilson's comment in ¶ 18 of their Response that "On Sunday night, October 23, 2016, the Investment Banker informed Ray Berens that the EvoShield's board of directors was leaning towards the Wilson bid as the best bid," is telling. At this point, the two bids on the table were (i) a guaranteed $7,200,000 from Wilson with only $6,000,000 of guaranteed cash to cover an estimated $5,700,000 of senior debt and closing costs; and (ii) the DV bid of $8,400,000, which provided the subordinate note holders a maximum of $2,000,000 rather than the $300,000-$1,000,000 being proposed by Wilson, not just for subordinate note holders, but for all remaining unsecured creditors holding $8,000,000 in debt, after the $1,300,000 of preferred vendors.

24. DV further responds to certain allegations in the Debtor's Sale Motion as follows:

25. Evoshield's allegation in footnote 4 of the Motion that "DV made a nonconforming noncash offer that EvoShield believes on information and belief included the participation of one or more of the Petitioners," is incorrect. Prior to the DV final bid on October 26, 2016, no Petitioning Creditor participated in or helped to create the DV bid. In fact,

even prior to the involuntary bankruptcy petition being filed on October 31, 2016, DV still had not shared any of its bids with any of the Petitioning Creditors.

26. Evoshield's allegation in ¶ 13 of the Motion that "EvoShield received no offers other than the Wilson APA that contained any cash payment to unsecured creditors," is incorrect. In fact, even in DV's initial bid, it explicitly offered over $6,500,000 in cash (over $5,000,000 to pay off the DV senior debt, $600,000 towards transaction costs and $900,000 to unsecured creditors).

27. Evoshield's allegation in ¶ 5 of the Motion that, "The closing date was delayed, in part, because the Debtor's secured lender, Dugout Ventures, LLC did not provide a payoff letter and raised issues about a prepayment penalty that was clearly not due, but the parties were prepared to close in escrow regardless of such lack of," is misleading, at best. DV did, in fact, provide a payoff quote to Evoshield on October 21, 2016 (with its bid), for a closing anticipated on October 31, 2016. However, this payoff quote included a prepayment fee separately stated, which was later disputed by Evoshield. Nonetheless, with this payoff quote already provided, Evoshield had all the information it needed to pay off DV's loan or to close in escrow as they alleged they were willing to do.

28. There were additional issues with respect to wiring instructions, and Evoshield apparently disputed other amounts in the payoff quote. However, I was not informed of these issues until Sunday, October 30, 2016, the day before the Wilson Sale was to close. Thus, the allegation that DV delayed the closing of the Wilson Sale is patently false, and by their own admission, irrelevant, as they claim they were willing to close in escrow.

29. Evoshield's allegations in ¶ 8 of the Motion, "In addition to the risk that the assets will bring less if the sale is delayed, EvoShield risks running out of operating cash should it be

forced to operate much longer. Dugout Ventures, LLC ("DV"), Evoshield's lender, extended additional funding to EvoShield beginning in August 2016. EvoShield has exhausted the additional funding and currently has approximately $191,000 of available cash," and "EvoShield's operating cash flow is negative," is also misleading and inconsequential.

30. DV has provided to Evoshield approximately $900,000 over the past nine weeks to cover approximately $900,000 of payments to vendors for new purchase orders. It is however incorrect that "operating cash flow is negative." In DV's weekly review of cash flow with Evoshield's management over the past few days, if no pre-petition liabilities are paid during the course of this bankruptcy case, and even with no additional funding, Evoshield expects to accumulate approximately $300,000 of additional operating cash over the next nine weeks, even after paying over $700,000 in payments to vendors for existing purchase orders, leaving the company with close to $500,000 in available cash by the end of this period.

31. But as stated above, DV is still willing to extend additional financing to Evoshield, if needed, for Evoshield's continued operations as a debtor-in-possession, if such financing is necessary.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 11th day of November, 2016, at Austin, Texas.

_____
Mark Walker

## **CERTIFICATE OF SERVICE**

I hereby certify that I have this day served a copy of the within and foregoing *RESPONSE OF DUGOUT VENTURES, LLC TO EVOSHIELD, LLC'S EMERGENCY MOTION FOR ENTRY OF ORDER APPROVING SALE OF SUBSTANTIALLY ALL THE ASSETS OF THE PUTATIVE DEBTOR UNDER SECTIONS 303 AND 363 OF THE BANKRUPTCY CODE* through the Clerk of Court using the CM/ECF system, which automatically sent e-mail notification of such filing to the ECF filers registered in this case.

This 11th day of November 2016.

/s/ *Eric W. Anderson*
Eric W. Anderson