## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF GEORGIA
## ATHENS DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| BASEBALL PROTECTIVE, LLC | ) | Bankruptcy Case No.: 16-31159 |
| f/k/a EvoShield, LLC, | ) | |
| | ) | JUDGE SMITH |
| Debtor. | ) | |
| | ) | |

DISCLOSURE STATEMENT WITH REGARD TO
CHAPTER 11 PLAN OF LIQUIDATION SUBMITTED BY
BASEBALL PROTECTIVE, LLC f/k/a EVOSHIELD, LLC
DEBTOR AND DEBTOR IN POSSESSION

June 12, 2017

Filed by:

BASEBALL PROTECTIVE, LLC f/k/a EVOSHIELD, LLC
Debtor and Debtor in Possession

Attorneys for Debtor:
Gregory D. Ellis
Georgia Bar No. 245310

LAMBERTH, CIFELLI,
 ELLIS & NASON, P.A.
1117 Perimeter Center West
Suite W212
Atlanta, GA  30338
(404) 262-7373
(404) 262-9911 (facsimile)
gellis@lcenlaw.com

# **DISCLAIMER**

*All Creditors and Interest Holders are advised and encouraged to read this Disclosure Statement and the Plan in their entirety. The Plan, summaries, and statements made in this Disclosure Statement are qualified in their entirety by reference to the Plan, the exhibits, and the Disclosure Statement as a whole.*

*This Disclosure Statement has been prepared in accordance with § 1125 of the Bankruptcy Code and Rule 3016(c) of the Federal Rules of Bankruptcy Procedure and not in accordance with federal or state securities laws. This Disclosure Statement has neither been approved nor disapproved by the Securities and Exchange Commission ("SEC"), nor has the SEC passed on the accuracy or adequacy of the statements contained herein. This Disclosure Statement was prepared to provide holders of Claims and Interests the Debtor with "adequate information" (as defined in the Bankruptcy Code) so that they can make an informed judgment about the Plan.*

*As to contested matters, adversary proceedings, and other actions or threatened actions, this Disclosure Statement shall not constitute nor be construed as an admission of any fact or liability, stipulation, or waiver, but rather as a statement made in settlement negotiations.*

*The information contained in this Disclosure Statement is included herein for the purpose of soliciting acceptances of the Plan and may not be relied upon for any purpose other than to make a judgment with respect to, and how to vote on, the Plan.*

*This Disclosure Statement shall not be admissible in any non-bankruptcy proceeding involving the Debtor and any party, nor shall it be construed to be conclusive advice on the tax, securities, or other legal effects of the Plan as to holders of Claims against, or Interests in, the Debtor.*

# UNITED STATES BANKRUPTCY COURT
# MIDDLE DISTRICT OF GEORGIA
# ATHENS DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| BASEBALL PROTECTIVE, LLC | ) | Bankruptcy Case No.: 16-31159 |
| f/k/a EvoShield, LLC, | ) | |
| | ) | |
| Debtor. | ) | |
| | ) | |

This "Disclosure Statement with Regard to Chapter 11 Plan Submitted by Baseball Protective, LLC f/k/a EvoShield, LLC" (the "Disclosure Statement") is submitted by Baseball Protective, LLC f/k/a EvoShield, LLC (the "Debtor" or "EvoShield"), to provide information to parties in interest about the "Chapter 11 Plan Submitted by Baseball Protective, LLC f/k/a EvoShield, LLC" (the "Plan") filed by the Debtor. This introductory section is qualified in its entirety by the detailed explanations which follow and the provisions of the Plan.

This Disclosure Statement sets forth certain information regarding the Debtor's history prior to the Petition Date. This Disclosure Statement also describes the Plan, alternatives to the Plan, effects of confirmation of the Plan, and the manner in which Distributions will be made under the Plan. In addition, this Disclosure Statement discusses the confirmation process and voting procedures that holders of Claims in impaired Classes must follow for their votes to be counted.

*This Disclosure Statement contains summaries of certain provisions of the Plan, statutory provisions, documents related to the Plan, events in the Debtor's Chapter 11 Case, and financial information. Although the Debtor believes that the Plan and related document summaries are fair and accurate, such summaries are qualified to the extent that they do not set forth the entire text of such documents or statutory provisions. The Debtor's management provided the factual information contained in this Disclosure Statement unless otherwise specifically noted. The Debtor is unable to warrant or represent that the information contained herein, including the financial information, is without any inaccuracy or omission. The Debtor has not subjected the financial data set forth herein to an independent audit.*

*Nothing contained herein shall (1) constitute an admission of any fact or liability by any party, (2) be admissible in any non-bankruptcy proceeding involving the Debtor or any other party; or (3) be deemed conclusive advice on the tax or other legal effects of the Debtor's Plan as to holders of Claims or Interests. You should consult your personal counsel or tax advisor on any questions or concerns regarding tax or other legal consequences of the Plan.*

*Except for historical information, all the statements, expectations, and assumptions, including expectations and assumptions contained in this Disclosure Statement, are forward looking statements that involve a number of risks and uncertainties. Although the Debtor has used its best efforts to be accurate in making these forward looking statements, it is possible that the assumptions made by the Debtor may not materialize. In addition, other important factors*

*could affect the prospect of recovery to creditors including, but not limited to, the inherent risks of litigation and the amount of Allowed Claims.*

Parties voting on the Plan should read both the Plan and this Disclosure Statement.

Unless otherwise defined, capitalized terms used in this Disclosure Statement have the meanings ascribed to them in the Plan.

The primary purpose of this Disclosure Statement is to provide parties entitled to vote on the Plan with adequate information so that they can make a reasonably informed decision prior to exercising their right to vote to accept or reject the Plan.

The Bankruptcy Court's approval of this Disclosure Statement constitutes neither a guaranty of the accuracy or completeness of the information contained herein, nor an endorsement of the Plan by the Bankruptcy Court.

When and if confirmed by the Bankruptcy Court, the Plan will bind the Debtor and all holders of Claims and Liens against and Interests in the Debtor, whether or not they are entitled to vote or did vote on the Plan and whether or not they receive or retain any distributions or property under the Plan.  Thus, you are encouraged to read this Disclosure Statement carefully.  In particular, holders of impaired Claims who are entitled to vote on the Plan are encouraged to read this Disclosure Statement, the Plan, and any exhibits to the Plan and Disclosure Statement, carefully and in their entirety before voting to accept or reject the Plan.   This Disclosure Statement contains important information about the Plan, the method and manner of distributions under the Plan, considerations pertinent to acceptance or rejection of the Plan, and developments concerning the Chapter 11 Case.

## I.      INTRODUCTION AND GENERAL INFORMATION

This is the disclosure statement (the "Disclosure Statement") in the chapter 11 case of Baseball Protective, LLC f/k/a EvoShield, LLC (the "Debtor").   This Disclosure Statement contains information about the Debtor and describes the Chapter 11 Plan (the "Plan") filed by the Debtor on June 12, 2017. A full copy of the Plan is attached to this Disclosure Statement as Exhibit A.  ***Your rights may be affected.   You should read the Plan and this Disclosure Statement carefully and discuss them with your attorney.  If you do not have an attorney, you may wish to consult one.***

The proposed distributions under the Plan are discussed at page 22 of this Disclosure Statement.  General unsecured creditors are classified in Class 1, and the Debtor estimates that general unsecured creditors will receive a distribution of 21.5% of their allowed claims.

### A.  Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing

The Court has not yet confirmed the Plan described in this Disclosure Statement.  This section describes the procedures pursuant to which the Plan will or will not be confirmed.

1.  *Time and Place of the Hearing to Finally Approve This Disclosure Statement and Confirm the Plan*

The hearing at which the Court will determine whether to finally approve this Disclosure Statement and confirm the Plan will take place on **[_____] 2017 , at __:__ __.m., at the U.S. Courthouse and Post Office, 115 East Hancock Avenue, Athens, Georgia 30601.**

2.  *Deadline for Voting to Accept or Reject the Plan*

If you are entitled to vote to accept or reject the Plan, vote on the enclosed ballot and return the ballot in the enclosed envelope to

Clerk, U. S. Bankruptcy Court
Middle District of Georgia
P. O. Box 1957
Macon, Georgia 31202
478-752-3506

See Section V.A. below for a discussion of voting eligibility requirements.

Your ballot must be received by **[_____]** or it will not be counted.

3.  *Deadline for Objecting to Confirmation of the Plan*

***Objections to Confirmation of the Plan may be filed until* [_____]2017.**  Objections to confirmation of the Plan must be filed with the Court and served upon counsel for the Debtor, Gregory D. Ellis, Lamberth, Cifelli, Ellis & Nason, P.A., 1117 Perimeter Center West, Suite W212, Atlanta, Georgia 30338 by **[_____].**

4.  *Identity of Person to Contact for More Information*

If you want additional information about the Plan, you should contact counsel for the Debtor, Gregory D. Ellis, Lamberth, Cifelli, Ellis & Nason, P.A., 1117 Perimeter Center West, Suite W212, Atlanta, Georgia 30338.

## II.  BACKGROUND

### A.  Description and History of the Debtor's Business

Debtor was a developer, marketer, and distributor of protective sports gear and associated branded apparel under the EvoShield name.  EvoShield used a unique Gel-to-Shell ("G2S") technology that provided custom-molded protection for athletes.  Sports gear with G2S is

3

custom-fitted to each athlete.  G2S components are packaged in a hermetically-sealed foil pack, and are either sold with a "carrier," such as a rib shirt or wrist sleeve, with insert pocket for the G2S component, or gauze wrap, which is used to keep the shield in place while curing.  G2S enabled the athlete to custom mold protection to the contours of his own body resulting in a better fit for the athlete and greater protection and comfort over plastic or foam alternatives.

From 2010 to 2013 Debtor's revenue increased at annual rate in excess of 100%.  To fund Debtor's growth, Debtor raised money through the sale of various classes of equity interests. In 2014 Debtor's growth slowed and Debtor's operating losses increased.

To fund the operating losses that were being incurred, the Debtor, beginning in June 2014, obtained loans from certain of its interest holders.  The loans were documented by notes that were subordinated to Debtor's senior secured lender Wells Fargo Bank, N.A.

A new 5 member board was elected in the 4th quarter of 2014. The Board Members were Gordon Beckham, William Dore, Jr., James Ellis, Thomas Lamb and Graham Manley.

The Board regularly provided updates to the members of the Debtor regarding the Debtor's operations and strategic options.  Among the options was obtaining capital to facilitate Debtor's growth and working capital needs or, alternatively, a sale of the Debtor's business.

On February 22, 2016 Consensus Advisory Services LLC and Consensus Securities LLC (the "Consensus Companies" or "Consensus") were retained by Debtor to identify sources of capital to facilitate Debtor's growth and working capital needs or, alternatively, to sell the Debtor's business. The Board and Consensus regularly provided updates to the Debtor's members during this process.

In July 2016 loans were obtained from Dugout Ventures, Inc. who had signed a letter of intent to merge with or purchase the Debtor. In the summer of 2016, Dugout Ventures, LLC purchased the senior loan of Wells Fargo Bank, N.A. During this time frame there were numerous discussions between the Debtor and Dugout Ventures, LLC and several agreements entered into between the Debtor and Dugout Ventures, LLC to permit the Debtor to continue its efforts to sell the Debtor's business. Pursuant to the sales procedures negotiated and agreed to with Dugout Ventures, LLC, the Debtor timely signed a binding agreement with Wilson Sporting Goods Co. on October 26, 2016.

A detailed description of the sale process and factors that led to the Debtor entering into the binding sale agreement with Wilson is set forth in the Declaration of Michael A. O' Hara, the Managing member and Chief Executive Officer of Consensus Advisory Services LLC and Consensus Securities LLC filed with the Bankruptcy Court on November 7, 2016 (Doc. No 10; the "O'Hara Declaration").

### B.    Involuntary Filing

Prior to and after the execution of the binding agreement with Wilson, several of the Debtor's Noteholders and members contacted the Board Members to request that the Board

Members consider alternatives other than a sale of the Debtor's assets, including Kenneth Baldwin. On October 31, 2016 (the "Petition Date"), Matt Stover, KB3 Interests, LLC (an entity controlled by Kenneth Baldwin), and Juanita Markwalter (collectively, the "Petitioners"), filed an involuntary petition for relief under Chapter 11 of the Bankruptcy Code (the "Petition") against the Debtor in order to prevent the sale to Wilson from closing.

### C.    Significant Events During the Bankruptcy Case

On November 7, 2016, Debtor filed its Emergency Motion for Entry of Order Approving Sale of Substantially all the Assets of the Putative Debtor under Sections 303 and 363 of the Bankruptcy Code (Doc. No. 13; the "Sale Motion"). The Sale Motion requested that the Court authorize the sale of substantially all the assets of Debtor to Wilson pursuant to the terms of an Asset Purchase Agreement dated October 26, 2016 between the Debtor and Wilson (the "Wilson APA"). The Wilson APA was attached to the Sale Motion as an Exhibit. On November 10, 2017, Debtor filed a Notice of Filing of Closing Exhibits (Doc. No. 21), attaching the exhibits to the Wilson APA used at the anticipated closing.

On November 16, 2016, the Court entered an order, after holding several days of evidentiary hearings, providing that pursuant to 11 U.S.C. § 549(a)(2)(B) the Debtor and Wilson were authorized to close the sale of assets pursuant to the terms of the Asset Purchase Agreement between them (Doc. No. 36). The sale closed on November 17, 2016. Thereafter Debtor changed its name to Baseball Protective, LLC.

Under the terms of the Wilson APA, Wilson purchased substantially all the assets of Debtor, including inventory, accounts receivable, and the Debtor's trade name and goodwill. The value of the Wilson APA to Debtor was in excess of $11,000,000, of which $7,200,000 was cash and $782,000 which was deposited in escrow for payment of sales and use taxes. In addition to the cash purchase price, Wilson agreed to assume certain liabilities.

From the cash purchase price, Debtor, through the closing agent Cohen, Pollock, Merlin & Small, P.C., paid $5,238,694 to Dugout Ventures, LLC pursuant to a payoff quote from Dugout Ventures, LLC dated November 17, 2016 which was as follows:

| | |
|---|---|
| Principal Balance | $ 5,000,000 |
| Accrued Interest as of 11/17/16 | $ 119,997 |
| Lenders Costs and Expenses | $ 118,696 |
| | |
| Total | $ 5,238,694 |

The costs and expenses of Dugout Ventures, LLC in the November 17, 2016 payoff letter consisted of a CRO Audit Fee of $ 20,000, travel expenses of $ 5,249 and legal fees of $ 93,447. The legal fees increased by $87,969 over a payoff quote received on the day of the involuntary filing. As discussed in more detail on page 8 of this Disclosure Statement, the Debtor intends to pursue claims against Dugout Ventures, LLC, including, without limitation, a return of unreasonable legal fees.

The Wilson APA established a $782,000 tax escrow (the "Tax Escrow Funds") for the payment of unpaid taxes. The $782,000 is being held in escrow by Cohen Pollock Merlin & Small, P.C. as escrow agent pursuant to an escrow agreement between Debtor, Wilson and Cohen Pollock Merlin & Small, P.C. (the "Tax Escrow Agreement"). The Wilson APA further contained a Tax Payment Agreement (the "TPA") that set forth agreements with respect to the resolution and satisfaction of unpaid sales taxes using the Tax Escrow Funds. The TPA was attached as an exhibit to the Wilson APA previously filed in this court, which exhibit is incorporated herein by reference. (Doc. No. 8-6 Pages 21-23 of 29).

In addition to payments made from Debtor's operating account, on November 23, 2017 the closing agent Cohen, Pollock, Merlin & Small, P.C., paid Debtor's counsel $103,413.50 from the cash proceeds of the closing of the sale to Wilson; $20,807.40 to Consensus on December 2, 2017; and $83,706.50 to Cohen, Pollock, Merlin & Small, P.C. on November 22 and November 23 for legal fees and expenses incurred in connection with the sale to Wilson.

On January 17, 2017, Cohen, Pollock, Merlin & Small, P.C transferred $1,359,148.34 to Debtor's Debtor-In-Possession operating account.

Cohen, Pollock, Merlin & Small, P.C retains the $782,000 tax escrow.

### D.    Management of the Debtor Before and During the Bankruptcy

As indicated above a new 5 member board was elected in the 4th quarter of 2014. The Board Members were Gordon Beckham, William Dore, Jr., James Ellis, Thomas Lamb and Graham Manley.  During the two years prior to the date on which the bankruptcy petition was filed the Debtor's president was James M Van Alstyne, the Debtor's Chief Financial Officer was Russ Allen, and Debtor's Director of Accounting and Controller was Sheron Moshell.

After the asset purchase agreement with Wilson was signed and prior to the Petition Date, Sheron Moshell, who also is a certified public accountant, agreed to be responsible to manage the financial affairs and liquidation of the Debtor at a monthly salary of $10,000 per month as the Debtor's Chief Liquidation Officer without benefits.

Subsequent to February 1, 2017 the Debtor no longer required the services of Ms. Moshell as a full time employee given the current status of the Case and accounting systems. As a result, through its Board of Directors, Ms. Moshell negotiated a services agreement where Ms. Moshell agreed to continue to provide services as Debtor's Chief Liquidation Officer at $80 per hour plus reimbursement for out of pocket expenses. On February 23, 2017, Debtor filed a Motion for Approval of Services Agreement with Debtor's Chief Liquidation Officer, Sheron Moshell (Doc. No. 104). On March 21, 2017, after notice and an opportunity for hearing, the Bankruptcy Court entered an Order Granting Motion for Approval of Services Agreement with Debtor's Chief Liquidation Officer, Sheron Moshell (Doc. No. 117).

After the Effective Date of the Plan, the Board and Ms. Moshell will continue to manage the Debtor for purposes of implementing the Plan.  None of the members of the Board will receive any compensation for this service.  Ms. Moshell will continue to be paid $80 per hour pursuant to the terms of the Services Agreement.

### E.      Payments During Gap Period

During the period between the filing date and entry of order for relief, the Debtor paid $397,613.71 to creditors from its operating accounts for deposits or for services.  A schedule of the payments is attached as Exhibit "B". During the gap period, Debtor's counsel reviewed the payments with Russ Allen or Sheron Moshell and except for payment to creditors under $1,500 which were paid to minimize disruption to the Debtor's business operations and to provide for an orderly operational transfer to Wilson and payments to Georgia Credit Union and Dell, which held purchase money security interests in assets that the Debtor had agreed to transfer to Wilson without encumbrances,  payments were either deposits for goods or payment for goods and services for which value was given substantially contemporaneously. As a result, the Debtor does not intend to pursue preference, fraudulent conveyance, or other avoidance actions.  In addition, Debtor paid its employees regular payroll, any paid time off, and expenses. Other than a payment to Stan Kanavage, who had been receiving regular monthly payments for severance under his employment contract in the approximate amount of $6,000, the payments were to current employees or employees whom had been terminated within 180 days of the bankruptcy such that the claims would be priority claims. The Debtor does not intend to pursue preference, fraudulent conveyance, or other avoidance actions with respect to any of these payments, including Mr. Kanavage, as Debtor's counsel has advised the Debtor that the costs to pursue such claims will likely exceed any recovery that would otherwise benefit the estate.

### F.      Projected Recovery of Avoidable Transfers

The Debtor does not intend to pursue preference, fraudulent conveyance, or other avoidance actions.  On its Schedules debtor identified $2,188,363.22 of payments to creditors with 90 days of the filing of the involuntary case, where the payments aggregated more than $6,425.   Neither Debtor not Debtor's counsel has done a detailed preference analysis, but Debtor's counsel did inquire of Sheron Moshell and Russ Allen the nature of Debtor's payments during this period. Of the $2,188,363.22, $727,071.04 was to Parker Medical Associates, and $262,173.84 to Richardson Cap. According to Russ Allen and Sharon Moshell, these creditors were requiring Debtor to pay in advance for the delivery of goods.  With respect to the other payments neither Mr. Allen nor Ms. Moshell had any knowledge of any payments made as a result of a threatened lawsuit or dunning letter or any specific knowledge that the payment terms were materially different from prior terms available to the Debtor.  Based on these discussions, Debtor's counsel believes that it is unlikely that a detailed preference review would be cost effective and that the costs to further investigate and potentially pursue such claims will likely exceed any recovery that would otherwise benefit the estate.  As a result, the Debtor does not intend to pursue preference, fraudulent conveyance, or other avoidance actions with respect to payments made within ninety days of the filing of the involuntary petition.

### G.   Claims Against Dugout Ventures, LLC

As indicated above the legal fees of Dugout Ventures, LLC increased by $87,969 between the actual payoff on November 17, 2016 and a payoff quote received on the day of the involuntary filing. The Debtor believes that these fees are unreasonable because they were incurred primarily as a result of Dugout's intention to prevent the proposed sale to Wilson from closing and not in connection with recovery of, protection of, or collection of its secured claim. In addition, the Debtor believes that it has claims against Dugout for tortious interference in the sale to Wilson and preventing the sale from closing prior to the filing of the Case. As a result of the delay, the Debtor incurred additional interest and legal fees for which it believes it is entitled to recover from Dugout. Finally, Debtor is investigating other potential claims against Dugout under applicable bankruptcy or nonbankruptcy law.

### H.   Claims and Claims Objections

Except to the extent that a claim is already allowed pursuant to a final non-appealable order, the Debtor reserves the right to object to claims.  The Plan provides that only the Debtor may file objections to Claims (whether filed, scheduled, or otherwise considered). Therefore, even if a claim is allowed for voting purposes, you may not be entitled to a distribution if an objection to your claim is later upheld.  Claim No. 7 filed by A.S.K. Sports was filed as a priority wage claim.  The Debtor intends to object to the allowance of the A.S.K. Sports claim as a priority wage claim and have it reclassified to a general unsecured claim.

### I.   Assets

As of April 30, 2017, the Debtor's debtor-in-possession operating account had a balance of $1,437,173.93 in addition to the tax escrow of $782,000.00. The Debtor estimates that after payment of taxes, $150,000 of additional funds from the balance of the tax escrow will be available for distribution.  The Debtor does not anticipate that there will be any additional material assets other than the possibility of a litigation recovery from Dugout Ventures, LLC.

## III.   VOTING ON THE PLAN AND THE
## CONFIRMATION PROCESS

### A.   Who May Vote

Only a holder of an Allowed Claim classified in an impaired Class is entitled to vote on the Plan.  Under § 1124 of the Bankruptcy Code, your Class is impaired under the Plan unless the Plan (1) leaves unaltered your legal, equitable, and contractual rights, or (2) cures any defaults under your contract, reinstates its maturity, compensates you for damages, and does not otherwise alter your rights.

In order to have an Allowed Claim you must (1) have timely filed a proof of claim or (2) been listed in the Schedules as having a Claim that is not contingent, unliquidated or disputed. You are not required to file proof of your Claim if your Claim is listed by the Debtor in the Schedules and is not shown as being contingent, unliquidated or disputed.  If your Claim was

scheduled as contingent, unliquidated or disputed, and if you did not file a proof of such Claim by the April 5, 2017 Bar Date set by the Bankruptcy Court (the "Claims Bar Date") or the date set forth in the Plan, or after such dates with leave of the Bankruptcy Court, or if your Claim is the subject of an objection, you do not have an Allowed Claim, cannot vote, and will not participate in any distributions under the Plan until your Claim becomes an Allowed Claim.

Only holders of Allowed Claims in an impaired Class may vote on the Plan. Creditors whose Claims are unclassified or unimpaired may not vote. Under the Plan, Administrative Claims, Priority Employee Claims and Priority Tax Claims are unclassified and not entitled to vote on the Plan. Under the Plan, Class 1 is impaired and entitled to vote on the Plan.

Under the Plan, the Interests of Equity Members are cancelled and holders of Interests receive nothing and are impaired. As a result Equity Members are deemed to reject the Plan and are not eligible to vote on the Plan.

### B.     Voting Instructions

A ballot with voting instructions is being distributed with this Disclosure Statement. Please read the instructions carefully to ensure that your vote will count.

IN ORDER FOR YOUR BALLOT TO COUNT IT MUST BE RECEIVED WITHIN THE TIME INDICATED ON THE BALLOT AND THE BALLOT MUST CLEARLY INDICATE YOUR CLAIM, THE CLASS OF YOUR CLAIM, AND THE AMOUNT OF YOUR CLAIM.

BY ENCLOSING A BALLOT, THE DEBTOR IS NOT ADMITTING THAT YOU ARE ENTITLED TO VOTE ON THE PLAN, IS NOT ADMITTING THAT YOUR CLAIM IS ALLOWED AS SET FORTH ON THE BALLOT, AND IS NOT WAIVING ANY RIGHTS TO OBJECT TO YOUR VOTE OR YOUR CLAIM.

### C.     Requirements of Confirmation

The Bankruptcy Court can confirm the Plan only if all the requirements of § 1129 of the Bankruptcy Code are met.  Those requirements include the following:

1.  The Plan classifies Claims and Interests in a permissible manner;

2.  The contents of the Plan comply with the technical requirements of the Bankruptcy Code;

3.  The Plan has been proposed in good faith and not by any means forbidden by law;

4.  The disclosures concerning the Plan are adequate and include information concerning all payments made or promised in connection with the Plan, as well as the identity, affiliations, and compensation to be paid to all officers, directors, and other insiders; and

5.    The principal purpose of the Plan is not the avoidance of tax or the avoidance of the securities laws of the United States.

In addition to the confirmation requirements described above, all impaired Classes of Claims entitled to vote on the Plan must vote in favor of the Plan.  If, however, the Plan has not been approved by all impaired Classes of Claims, the Court may nevertheless "cram down" the Plan over the objections of a dissenting Class. The Plan may be "crammed down" so long as it does not discriminate unfairly, is fair and equitable with respect to each dissenting Class of Claims, and at least one impaired Class has voted in favor of the Plan without regard to any votes of insiders.

### D.        Acceptance or Rejection of the Plan and Cram Down

The Class containing your Claim will have accepted the Plan by the favorable vote of majority in number and two-thirds in amount of Allowed Claims actually voting. In the event that any impaired Class of Claims does not accept the Plan, the Bankruptcy Court may still confirm the Plan if an impaired Class accepts it and if, as to each impaired Class that has not accepted the Plan, the Plan "does not discriminate unfairly" and is "fair and equitable."  If you hold an Allowed Secured Claim, the Plan is fair and equitable if the Plan provides that your Lien attaches to the proceeds of a sale of your collateral and you are paid from such proceeds the value of your Lien. If you hold an Unsecured Claim, the Plan is fair and equitable if you receive property of a value equal to the allowed amount of your Claim or if no junior Class receives or retains anything under the Plan.

### E.        Confirmation Hearing

The Bankruptcy Court has scheduled a hearing on confirmation of the Plan ("Confirmation Hearing") at the time indicated in the Order Approving Disclosure Statement and Notice of Confirmation Hearing.  The Confirmation Hearing may be adjourned from time to time without further notice except for announcement at the Confirmation Hearing or notice to those parties present at the Confirmation Hearing.

### F.        Objections to Confirmation

As will be set forth in the Order Approving Disclosure Statement and Notice of Confirmation Hearing, any objections to confirmation of the Plan must be in writing, set forth the objector's standing to assert any such objection, and must be filed with the Bankruptcy Court and served on counsel for the Debtor and the Debtor. The Order Approving Disclosure Statement and Notice of Confirmation Hearing contains all relevant procedures relating to the submission of objections to confirmation and should be reviewed in its entirety by any party who has an objection to confirmation.

## IV.   SUMMARY OF THE PLAN AND TREATMENT OF CLAIMS AND EQUITY INTERESTS

### A.   What is the Purpose of the Plan of Liquidation?

As required by the Bankruptcy Code, the Plan places claims and equity interests in various classes and describes the treatment each class will receive. The Plan also states whether each class of claims or equity interests is impaired or unimpaired. If the Plan is confirmed, your recovery will be limited to the amount provided by the Plan.

### B.   Unclassified Claims

Certain types of claims are automatically entitled to specific treatment under the Bankruptcy Code. They are not considered impaired, and holders of such claims do not vote on the Plan. They may, however, object if, in their view, their treatment under the Plan does not comply with that required by the Bankruptcy Code. As such, the Debtor has *not* placed the following claims in any class:

1.   *Administrative Expenses*

Administrative expenses are costs or expenses of administering the Debtor's chapter 11 case which are allowed under § 507(a)(2) of the Bankruptcy Code. Administrative expenses also include the value of any goods sold to the Debtor in the ordinary course of business and received within 20 days before the date of the bankruptcy petition. The Bankruptcy Code requires that all administrative expenses be paid on the Effective Date of the Plan, unless a particular claimant agrees to a different treatment. The Debtor projects that it will incur $12,500 in administrative expenses through the Effective Date, including U.S. Trustee Fees quarterly fees and payments due to Sheron Moshell.

The following chart lists the Debtor's estimated administrative expenses and their proposed treatment under the Plan:

| Type | Estimated Amount Owed | Proposed Treatment |
|---|---|---|
| Expenses Arising in the Ordinary Course of Business After the date of entry of the Order for Relief | $ 0.00 | Paid in full on the Effective Date of the Plan, or according to terms of obligation if later |
| The Value of Goods Received in the Ordinary Course of Business Within 20 Days Before the Petition Date | $ 0.00 | Paid in full on the Effective Date of the Plan, or according to terms of obligation if later |

| Type | Estimated Amount Owed | Proposed Treatment |
|---|---|---|
| Professional Fees, as approved by the Court. | $190,000.00[1] | Paid in full as soon as practicable after the later of the Effective Date or the date such Claim becomes an Allowed Administrative Claim, unless otherwise agreed to by the Holder thereof. |
| Clerk's Office Fees | $0.00 | Paid in full on the Effective Date of the Plan |
| Office of the U.S. Trustee Fees | $0.00 | Paid in full on the Effective Date of the Plan |
| TOTAL | $190,000.00 | |

A description of the professional fees is below:

**Fees of Petitioners**

On November 23, 2016, the Petitioners filed the "Application of McGuire Woods LLP. Rick Causey and Crain, Caton & James, P.C. for Administrative Expense Claim (Doc. No. 41) as amended on November 28, 2016 (Doc. No. 43; the "Application") seeking allowance of $106,184.70 of total fees, consisting of $87,037.20 for McGuire Woods, LLP, $13,575.00 for Rick Causey, consultant, and $5,572.50 for Crain, Caton & James, P.C., and $1,890.25 in expenses incurred on behalf of the Petitioning Creditors, for a total request of $108,074.95.

On December 16, 2016 the Debtor filed its "Objection of Debtor to Application of McGuire Woods LLP, Rick Causey and Crain, Caton & James, P.C." (Doc. No. 71; the "Objection").

On December 27, 2016, Debtor filed its schedules and scheduled the Petitioners' claims as follows: a claim of $67,370.64 for Matt Stover (the "Stover Claim"); a claim of $134,554.04 for Juanita Markwalter (the "Markwalter Claim"); and a claim of $336,385.10 for KB3 Interests, LLC (the "KB3 Interests, LLC Claim").

The Court conducted a preliminary hearing on March 21, 2017 on the Application and Objection (the "Preliminary Hearing") and preliminary ruled that the fees of the Petitioners incurred in objecting to the Sale Motion were not compensable.

Following negotiations after the Preliminary Hearing, Debtor and Petitioners reached an agreement (the "Settlement Agreement") to resolve the disputes raised in the Objection and potential disputes between the Debtor and Petitioners, subject to Bankruptcy Court approval.

---

[1] This estimate excludes fees of Debtor's counsel secured by a retainer of $25,000.00

Significant terms of the Settlement Agreement are as follows:

a.  The Debtor shall make payment to the Petitioning Creditors in the amount of $15,000.00 (the "Settlement Payment"); and

b.  Except for: (i) the Settlement Payment; and, (ii) any distribution(s) on account of the Stover Claim, the Markwalter Claim and the KB3 Interests, LLC Claim, Stover, Markwalter and KB3 Interests, LLC will release any claim against the Debtor, Debtor's estate and Debtor's officers and directors[2], including any administrative claim or substantial contribution claim under 11 U.S.C. §503(b)(3)(D) and (b)(4)  and any alleged claim for breach of fiduciary duties against the Debtor's officers and directors.

The Debtor anticipates filing a motion to approve the Settlement Agreement before the hearing on approval of the Disclosure Statement.

### Tax Preparation Fees

W. Chase Idol has prepared Debtor's tax returns since 2009 in the ordinary course of Debtor's business.  Mr. Idol has agreed to prepare the Debtor's 2016 Federal and State of Georgia Partnership Income Tax Returns and 2017 Clarke County Property Tax Return for a fixed fee of $4,500.   The Debtor anticipates that this fee will be paid prior to June 30, 2017.  W. chase Idol is not holding a retainer.

### Special Tax Counsel

On May 10, 2017 the First Interim Application of the Asbury Law Firm for Allowance of Compensation and Reimbursement of Expenses as Special Tax Counsel for the Debtor filed pursuant to which Asbury seeks allowance of interim compensation in the amount of $21,606.50 and the reimbursement of out-of-pocket expenses in the amount of $79.71 for the period from December 27, 2016 through April 27, 2017 and anticipates that the applied for fees and expenses will be paid prior to June 30, 2017.   Debtor estimates that the total fees of tax counsel through the Effective Date will be $75,000.  The Asbury Law Firm is not holding a retainer.

### Debtor's counsel

Debtor's counsel, Lamberth, Cifelli, Ellis & Nason, P.A. ("LCEN"), projects that its fees through the Effective Date will be $115,000.  LCEN is holding a retainer of $25,000.

---

[2] Debtor's board members are Gordon Beckham, William Dore, Jr., James Ellis, Thomas Lamb and Graham Manley. Debtor's current and former officers and directors, include, without limitation, Sheron Moshell, Russ Allen, and Mike Van Alstyne.

2.    *Priority Employee Claims*

On or about May 24, 2017 Debtor filed an amendment to its schedules, adding $1,364.18 of priority employee claims consisting of funds due employees for a clerical failure to deposit the funds into the employee's 401k plan.

a.   Adam Whitaker; $143.11
b.   Brandon Duncan; $170.94
c.   Eris Jackson; $20.46
d.   Jeff Gaines; $153.05
e.   Jeffery May; $103.36
f.   Marcus McQuien; $139.14
g.   Robert Williams; $477.03
h.   Ryan Christman; $103.36
i.   Sheron Moshell; $53.68; and

3.    *Priority Tax Claims*

Priority tax claims are unsecured income, employment, and other taxes described by § 507(a)(8) of the Bankruptcy Code.

The Debtor has identified priority tax claims for custom duties and sales taxes.  With respect to custom duties, CV International, Inc. has filed a claim for $6,433.10 of which $2,943.28 was for a customs duty.

With respect to sales taxes, the Wilson APA established a $782,000 tax escrow for the payment of unpaid sales taxes.  The Wilson APA further contained a Tax Payment Agreement. The Tax Payment Agreement provided that Debtor will hire, at its sole cost and expense, Anson Asbury of the Asbury Law Firm, to i) prepare a plan to identify states for the purpose of negotiating and entering into a voluntary disclosure or similar agreement with respect to all taxes that are due with respect to sales and use or any similar state and local taxes imposed on sales made by Debtor  and any affiliated entity, or sales representative or distributor of Debtor or Debtor's products prior to the closing of the Wilson APA; ii) generally supervise the filing and preparation of returns to establish Debtor's tax liability to the Plan; and iii) assist Debtor in complying with the terms of the Tax Payment Agreement.

On January 9, 2017, Debtor filed an Application to Employ The Asbury Law Firm as Special Tax Counsel to the Debtor (Doc. No. 87).  On January 20, 2017 the Bankruptcy Court entered an Order Approving Employment of The Asbury Law Firm as Special Tax Counsel to the Debtor (Doc. No. 91).

The Debtor with the assistance of Special Tax Counsel prepared and proposed a tax plan to Wilson in accordance with the terms of the Wilson APA and Tax Payment Agreement. In general the plan provides as follows:

14

   i.   The Debtor will approach 21 states for the purpose of filing voluntary disclosure agreements ("VDA")[3] on or before April 15, 2017.

   ii.   The Debtor will be authorized to use the Tax Escrow Funds to satisfy payments under the terms of any VDA with the consent of Wilson, which consent shall not be unreasonably withheld.

   iii.   The Debtor will serve a Bar Order and Notice to all states establishing a bar date within 90 days of the service of the notice (or such other time as the Bankruptcy Court may require) as a bar date for the filing of sales tax claims in the Bankruptcy Court.

   iv.   The fees of the Escrow Agent shall be allowed to be paid from the Sales Tax Escrow; and

   v.   The Expenses of any tax preparation service, which do not include fees of Special Tax Counsel or other expenses incurred by Debtor, shall be allowed to be paid from the Sales Tax Escrow.

Based on the analysis done with the assistance of Debtor's Special Tax Counsel, Debtor estimates that the total potential liability, including interest and penalties, and assuming liability in every state with the availability of VDA treatment in 21 states is approximately $582,000 as of February 1, 2017.[4] The 21 states to which the Debtor intends to submit VDAs account for approximately $476,000 of the $582,000 estimated liability. Debtor believes that the necessary nexus does not exist in some states other than the 21 and that actual liability for unpaid sales taxes will be less.

On February 23, 2017 Debtor filed a Motion to Authorize Payment of Pre-Petition Sales Taxes and other Expenses from Tax Escrow Established Under Asset Purchase Agreement Between Debtor and Wilson Sporting Goods Co. (Doc. No. 102). On March 21, 2017, the Bankruptcy Court entered its Order Granting Motion to Authorize Payment of Pre-Petition Sales Taxes and Other Expenses from Tax Escrow Established Under Asset Purchase Agreement Between Debtor and Wilson Sporting Goods Co. (Doc. No. 116).

The Plan provides that with respect to Priority Tax Claims the bar date will be the first Business Day that is thirty (30) days after the Effective Date or such other date set by the Court Debtor currently intends to file a motion to set a claims deadline for the filing of claims by tax authorities on or before July 31, 2017 which will require that all claims for taxes be filed on or before October 31, 2017.

The Plan provides that with respect to Priority Tax Claims the Debtor shall establish a reasonable reserve taking into account the Tax Escrow Funds in such amount as is agreed to by Debtor and Wilson; in the event the Debtor and Wilson cannot agree on an amount, the amount

---

[3] Since VDA treatment is only available through voluntary disclosure, identification of the actual states at this time could potentially prevent Debtor from being able to utilize the VDA process.

[4] Until payment, additional interest and penalties may continue to accrue.

of the reserve shall be determined by the Court. Until such reserve is agreed to or determined by the Court, the Debtor can not make a Distribution to Holders of General Unsecured Claims. The Debtor anticipates that it will be able to reach agreement with Wilson or have sufficient information to have the Bankruptcy Court determine the reserve no later than November 30, 2017, 30 days after expiration of the anticipated bar date for Priority Tax Claims.

4.      *Other Unclassified Claims*

Other unclassified Claims are Gap Period Claims, Post-Confirmation Administrative Claims. Post-Confirmation Administrative Claims, other than Post-Confirmation Professional Fee Claims, shall be paid as the same come due, without the necessity of Bankruptcy Court approval. Post-Confirmation Professional Fee Claims shall be subject to review by the Notice Parties as describe in detail in Section 2.03(a) of the Plan. The Debtor projects that Post-Confirmation Professional Fee Claims of $50,000 primarily in connection with resolution of issues with outstanding tax claims and $12,500 in operating expenses for fees of Sheron Moshell. The Debtor is unaware of any unpaid Gap Period Claims.

**C.      Classes of Claims and Equity Interests**

The following are the classes set forth in the Plan, and the proposed treatment they will receive under the Plan:

1.      *Class of General Unsecured Claims*

General unsecured claims are not secured by property of the estate and are not entitled to priority under § 507(a) of the Bankruptcy Code. The following chart identifies the Plan's proposed treatment of Class 2, which contains general unsecured claims against the Debtor:

| Class # | Description | Impairment | Treatment |
|---------|-------------|------------|-----------|
| 1 | General Unsecured Class | Impaired | Allowed General Unsecured Claims shall receive their Pro Rata Share from the Distribution Fund |

Based on a review of the Debtor's Schedules and Claims the Debtor believes that the Allowed General Unsecured Claims against the Debtor consist of the following claims totaling $6,061,403.41:

Allowed General Unsecured Claims:

| | |
|---|---:|
| Githens & Associates, Inc. | $124,788.22 |
| Gordon Beckham, Jr. | $123,855.11 |
| HFM Charitable Remainder | $672,770.20 |
| James Ellis | $259,860.00 |
| James Manley | $371,342.96 |
| Juanita H. Markwalter | $134,554.04 |
| KB3 Interests, LLC | $336,385.10 |
| Matt Stover | $67,370.64 |
| Stan Kanavage | $29,384.62 |
| The McCamish Group | $2,197,383.00 |
| Tom Lamb | $4,194.73 |
| Tom Lamb | $260,044.02 |
| William Dore, Jr. | $1,753,358.05 |
| Great American Leasing | $53,589.68 |
| Yahoo! Inc. | $2,926.52 |
| Ted Hatzler Sales | $66,832.25 |
| CV International, Inc. | $3,489.82 |
| First American Payment Systems | $992.93 |
| BA Sales Agency | $65,863.13 |
| A.S.K. Sports | $15,687.22 |
| Georgia Natural Gas | $266.20 |
| Wells Fargo Vendor Financial Services, LLC | $10,960.47 |
| Sams Club | $702.57 |
| | |
| Total | $6,061,403.41 |

2.    *Class of Equity Interest Holders*

Equity interest holders are parties who hold an ownership interest (*i.e.*, equity interest) in the Debtor. In a limited liability company ("LLC"), the equity interest holders are the members.

The following chart sets forth the Plan's proposed treatment of the class of equity interest holders:

| Class # | Description | Impairment | Treatment |
|:---:|---|---|---|
| 2 | Equity interest holders | Impaired | The Holders of Class 2 Interests shall receive no property of any value under the Plan. |

17

D.      **Means of Implementing the Plan**

1.      *Source of Payments*

Payments and distributions under the Plan will be funded from a distribution fund which will consist of the Distribution Property. The Distribution Property are the net proceeds, after payment of all Administrative Claims and Post-Confirmation Administrative Claims, arising from the sale and collection of all: (i) Cash on hand or on deposit with utilities or any other person as of the Effective Date; and (ii) Debtor's rights to any insurance or tax refunds or litigation recoveries.

2.      *Post-confirmation Management*

After the Effective Date of the Plan, the Board and Ms. Moshell will continue to manage the Debtor for purposes of implementing the Plan. After the Effective Date of the Plan, the Board and Ms. Moshell will continue to manage the Debtor for purposes of implementing the Plan. None of the members of the Board will receive any compensation for this service. Ms. Moshell will continue to be paid $80 per hour pursuant to the terms of the Services Agreement.

E.      **Risk Factors**

The projected distributions under the proposed Plan are dependent on the resolution of sales taxes being as anticipated. If the Debtor has sales tax liability and/or the expense incurred in connection with resolving Debtor's tax liability, the projected distribution will be less than projected.

F.      **Executory Contracts and Unexpired Leases**

All executory contracts and unexpired lease other than Insurance Policies are to be rejected under the Plan. The Plan provides that Insurance Policies are to be assumed. Any claim based on the rejection of a contract or lease will be barred if the proof of claim is not timely filed, unless the Court orders otherwise. The Debtor is unaware of any executory contracts that have not been rejected other than Insurance Policies.

G.      **Tax Attributes and Tax Consequences of Plan**

Tax consequences resulting from confirmation of the Plan can vary greatly among the various classes of creditors and holders of interests, or within each class. Significant tax consequences may occur as a result of confirmation of the Plan under the Internal Revenue Code and pursuant to state, local, and foreign tax statutes. Because of the various tax issues involved, the differences in the nature of the claims of various creditors, the taxpayer status and methods of accounting and prior actions taken by creditors with respect to their claims, as well as the possibility that events subsequent to the date hereof could change the tax consequences, this discussion is intended to be general in nature only. No specific tax consequences to any creditor or holder of an interest are represented, implied, or warranted. Each holder of a claim or interest should seek professional tax advice, including the evaluation of recently enacted or pending

legislation, because recent changes in taxation may be complex and lack authoritative interpretation.

**THE DEBTOR ASSUMES NO RESPONSIBILITY FOR THE TAX EFFECT THAT CONSUMMATION OF THE PLAN WILL HAVE ON ANY GIVEN HOLDER OF A CLAIM OR INTEREST.  EACH HOLDER OF A CLAIM OR INTEREST IS STRONGLY URGED TO CONSULT THEIR OWN TAX ADVISORS CONCERNING THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PLAN.**

The receipt by a creditor of cash or property in full or partial payment of its claim may be a taxable event.  To the extent that a portion of the cash or the fair market value of any property received is attributable to accrued and unpaid interest on a claim being paid, a creditor may recognize interest income. A creditor may also recognize gain or loss equal to the difference between the sum of the amount of cash received and the adjusted basis in the claim for which the holder receives amounts under the Plan. Such gain or loss may be treated as ordinary or capital depending upon whether the claim is a capital asset.

The Debtor is a limited liability company and the tax attributes of the Debtor are passed through to the Equity Members as if it were a partnership.   Basis is generally determined by the Equity Member's share of income and losses and contributions to the Debtor.  The Debtor sold its assets at a loss and the losses are allocated to the Equity Members in accordance with the Debtor's operating agreement.  The tax consequences to the Equity Members are heavily dependent on the Equity Members' basis in their Interests and the ability to recognize losses and adjust basis are dependent on and subject to limitations under the Internal Revenue Code.

The Equity Members will not be receiving any distribution of cash or property under the Plan that would require an adjustment to the Equity Members basis on account of a distribution.

A limited liability company is ordinarily treated as terminating for tax purposes (regardless of whether it actually terminates) if it stops doing business as limited liability company and Equity Members may be able to recognize a capital loss depending on each Equity Member's basis, subject t to limitations under the Internal Revenue Code.

## V.    CONFIRMATION REQUIREMENTS AND PROCEDURES

To be confirmable, the Plan must meet the requirements listed in §§ 1129(a) or (b) of the Bankruptcy Code.  These include the requirements that:  the Plan must be proposed in good faith; at least one impaired class of claims must accept the Plan, without counting votes of insiders; the Plan must distribute to each creditor and equity interest holder at least as much as the creditor or equity interest holder would receive in a chapter 7 liquidation case, unless the creditor or equity interest holder votes to accept the Plan; and the Plan must be feasible.  These requirements are <u>not</u> the only requirements listed in § 1129, and they are not the only requirements for confirmation.

### A.      Who May Vote or Object

Any party in interest may object to the confirmation of the Plan if the party believes that the requirements for confirmation are not met.

Many parties in interest, however, are not entitled to vote to accept or reject the Plan.  A creditor has a right to vote for or against the Plan only if that creditor has a claim that is both (1) allowed or allowed for voting purposes, and (2) impaired.

In this case, the Debtor believes that Class 1 is impaired and that holders of claims in this class are therefore entitled to vote to accept or reject the Plan.  The holders of Interests in Class 2 will not receive or retain any property under the Plan, and, pursuant to Section 1126(g) of the Bankruptcy Code, are deemed to reject the Plan, and, therefore, are not entitled to vote to accept or to reject the Plan.

#### 1.      *What Is an Allowed Claim?*

Only a creditor with an allowed claim has the right to vote on the Plan.  Generally, a claim or equity interest is allowed if either (1) the Debtor has scheduled the claim on the Debtor's schedules, unless the claim has been scheduled as disputed, contingent, or unliquidated, or (2) the creditor has filed a proof of claim or equity interest, unless an objection has been filed to such proof of claim or equity interest.  When a claim or equity interest is not allowed, the creditor or equity interest holder holding the claim or equity interest cannot vote unless the Court, after notice and hearing, either overrules the objection or allows the claim or equity interest for voting purposes pursuant to Rule 3018(a) of the Federal Rules of Bankruptcy Procedure.

***The deadline for filing a proof of claim in this case for General Unsecured Creditors was April 5, 2017.***

#### 2.      *What Is an Impaired Claim?*

As noted above, the holder of an allowed claim has the right to vote only if it is in a class that is *impaired* under the Plan.  As provided in § 1124 of the Bankruptcy Code, a class is considered impaired if the Plan alters the legal, equitable, or contractual rights of the members of that class.

#### 3.      *Who is **Not** Entitled to Vote?*

The holders of the following five types of claims and equity interests are *not* entitled to vote:

- holders of claims and equity interests that have been disallowed by an order of the Court;

- Holders of other claims or equity interests that are not "allowed claims" or "allowed equity interests" (as discussed above), unless they have been "allowed" for voting purposes.

- holders of claims entitled to priority pursuant to §§ 507(a)(2), (a)(3), and (a)(8) of the Bankruptcy Code;

- holders of claims or equity interests in classes that do not receive or retain any value under the Plan, including Class 2 (Interests); and

- administrative expenses

*Even If You Are Not Entitled to Vote on the Plan, You Have a Right to Object to the Confirmation of the Plan and to the Adequacy of the Disclosure Statement.*

4.      *Who Can Vote in More Than One Class?*

Since there is only one voting class (Class 1) under the Plan, no creditor can vote in more than one class or cast more than one ballot for or against the Plan.

**B.      Votes Necessary to Confirm the Plan**

If impaired classes exist, the Court cannot confirm the Plan unless: (1) at least one impaired class of creditors has accepted the Plan without counting the votes of any insiders within that class, and (2) all impaired classes have voted to accept the Plan, unless the Plan is eligible to be confirmed by a "cram down" on non-accepting classes, as discussed in Section B.2. below.

1.      *Votes Necessary for a Class to Accept the Plan*

A class of claims accepts the Plan if both of the following occur: (1) the holders of more than one-half (1/2) of the allowed claims in the class, who vote, cast their votes to accept the Plan, and (2) the holders of at least two-thirds (2/3) in dollar amount of the allowed claims in the class, who vote, cast their votes to accept the Plan.

A class of equity interests accepts the Plan if the holders of at least two-thirds (2/3) in amount of the allowed equity interests in the class, who vote, cast their votes to accept the Plan; however, there is no class of equity interests entitled to vote on the Plan in this case.

2.      *Treatment of Nonaccepting Classes*

Even if one or more impaired classes reject the Plan, the Court may nonetheless confirm the Plan if the nonaccepting classes are treated in the manner prescribed by § 1129(b) of the Bankruptcy Code.  A plan that binds nonaccepting classes is commonly referred to as a "cram down" plan.  The Bankruptcy Code allows the Plan to bind nonaccepting classes of claims or

equity interests if:  it meets all the requirements for consensual confirmation except the voting requirements of § 1129(a)(8) of the Bankruptcy Code; does not "discriminate unfairly"; and is "fair and equitable" toward each impaired class that has not voted to accept the Plan.

***You should consult your own attorney if a "cramdown" confirmation will affect your claim or equity interest, as the variations on this general rule are numerous and complex.***

### C.    Liquidation Analysis

To confirm the Plan, the Court must find that all creditors and equity interest holders who do not accept the Plan will receive at least as much under the Plan as such claim and equity interest holders would receive in chapter 7 liquidation.  The Debtor's liquidation analysis is set forth below:

| | | |
|---|---|---|
| Cash in Debtor-in-Possession | | |
| Operating Account as of April 30, 2017 | | $1,437,173.93 |
| Excess Proceeds From Tax Escrow | | $ 150,000.00 |
| Total Available Cash | | $1,587,173.93 |
| Less Professional Fees | | ($ 190,000.00) |
|     Petitioning Creditors | $ 15,000 | |
|     Tax Preparation | $ 4,500 | |
|     Tax Counsel | $ 75,000 | |
|     Debtor Counsel | $ 95,500 | |
| Less Operating Expenses | | ($ 25,000.00) |
| Less US Trustee Fees[5] | | ($ 14,950.00) |
| Less Post-Confirmation Administrative Expenses | | ($ 50,000.00) |
| Net funds Available for Distribution | | $1,322,173.93 |
| Employee Priority Claims | | 1,364.13 |
| Custom Duty Claim | | 2,943.28 |
| Net for Unsecured | | $1,307,866.32 |
| Total Unsecured | | $6,061,403.41 |

Based on the above projection, Debtor estimates a distribution of approximately 21.5% on unsecured claims.

The only alternative to the Debtor's liquidation plan is liquidation under Chapter 7 of the Bankruptcy Code.  Under a Chapter 7, statutory fees of the Trustee would be approximately $90,000.  This is approximately $75,000 more than Debtor's estimate of quarterly US Trustee fees.  Debtor also believes that there would be additional expenses in the form of professional

---

[5] One quarter at $1,000,000 to $1,999,999.99 for $6,500; one quarter at $300,000 to $999,999.99 at $4,875.00 and 2 quarters at $225,000 to $299,999.99 at $1,950 each.

fees incurred by a Trustee's professionals in the event of a conversion to a Chapter 7 in order to assist the Trustee that will be avoided under a confirmed plan. In any event, Debtor believes that the liquidation plan will result in a distribution that is more than what would be received in Chapter 7 liquidation due to the avoidance of statutory trustee fees and professional fees. Finally, Debtor believes that the distributions under the Plan will be made much earlier than a distribution under a Chapter 7 liquidation.

### D.    Feasibility

The Debtor has cash on hand to make the required Plan payments.

## VI.    EFFECT OF CONFIRMATION OF PLAN

### A.    No Discharge of Debtor

No Discharge. In accordance with § 1141(d)(3) of the Bankruptcy Code, the Debtor will not receive any discharge of debt in this Case.

### B.    Modification of Plan

The Debtor may modify the Plan at any time before confirmation of the Plan.  In the event of any modification on or before confirmation, any votes to accept or reject the Plan shall be deemed to be votes to accept or reject the Plan as modified, unless the Bankruptcy Court finds that the modification materially and adversely affects the rights of parties which have cast said votes.

The Debtor may also seek to modify the Plan at any time after confirmation only if:  (1) the Plan has not been substantially consummated; *and* (2) the Court authorizes the proposed modifications after notice and a hearing.

### C.    Final Decree

Once the estate has been fully administered, as provided in Rule 3022 of the Federal Rules of Bankruptcy Procedure, the Debtor, or such other party as the Court shall designate in the Plan or Confirmation Order, shall file a motion with the Court to obtain a final decree to close the case.  Alternatively, the Court may enter such a final decree on its own motion.

## VII.    OTHER PLAN PROVISIONS

### A.    Exculpation and Injunction

The Plan provides that until the Effective Date, all injunctions or stays provided for in the Chapter 11 Case under Bankruptcy Code Sections 105(a) or 362, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect. The Plan further provides that after the Effective Date, all injunctions or stays provided for in the Chapter 11 Case under

Bankruptcy Code Sections 105(a) or 362, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the final Distribution Date or the Debtor's Chapter 11 Case is closed.

The Plan also contains a permanent injunction, subject to relief pursuant to the provisions of the Plan, in favor of (i) the Debtor; (ii) the Debtor's respective Professional Persons acting directly or indirectly in, relating to, or arising out of, their capacities as such; (iii) Sheron Moshell, Russ Allen, and Mike Van Alstyne acting directly or indirectly in, relating to, or arising out of, their capacities as an officer, employee, or agent of the Debtor; (iv) Gordon Beckham, William Dore, Jr., James Ellis, Thomas Lamb and Graham Manley acting directly or indirectly in, relating to, or arising out of, their capacities as member of the board or officers or directors of Debtor; and (v) Wilson.

Finally the Plan contains an exculpation of in favor of (i) the Debtor; (ii) the Debtor's respective Professional Persons acting directly or indirectly in, relating to, or arising out of, their capacities as such; (iii) Sheron Moshell, Russ Allen, and Mike Van Alstyne acting directly or indirectly in, relating to, or arising out of, their capacities as an officer, employee, or agent of the Debtor; (iv) Gordon Beckham, William Dore, Jr., James Ellis, Thomas Lamb and Graham Manley acting directly or indirectly in, relating to, or arising out of, their capacities as member of the board or officers or directors of Debtor; and (v) Wilson.

The terms of the injunction and exculpation in the Plan are set forth below:

(a)     **Terms of Injunction.**  *Except as otherwise expressly provided in the Plan, or the Confirmation Order, all Persons who have held, hold or may hold Claims against, or Equity in, the Debtor are permanently enjoined, on and after the Effective Date, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, from taking any of the following actions against the Exculpated Parties on account of, in connection with, or related to, in any manner whatsoever, whether directly or indirectly, such Claims or Interests:  (a) commencing or continuing in any manner any action or other proceeding of any kind; (b) the enforcement, attachment, collection, or recovery by any manner or means of judgment, award, decree or order; (c) creating, perfecting, or enforcing any encumbrance of any kind; (d) asserting any right of setoff, recoupment or subrogation of any kind; and (e) commencing or continuing in any manner or in any place any suit, action or other proceeding that does not comply with or is inconsistent with the provisions of the Plan.  The foregoing injunction will extend to successors of the Exculpated Parties.*

(b)     **Relief from Injunction**.  *Any Person asserting a claim against one or more of the Exculpated Parties that is enjoined under Section 7.06(a) of the Plan and that is not otherwise exculpated under the Plan may seek relief from the injunction contained in Section 7.06(a) of the Plan by filing with the Bankruptcy Court an explanation of the claim against the, a description of the action(s) the holder desires to take on account of such claim and by thereafter obtaining an order of the Bankruptcy Court allowing the holder to assert the claim. The Bankruptcy Court shall enter such order upon the finding that (i) the claim is for gross negligence, willful misconduct, or breach of fiduciary duty, (ii verified facts sufficient to state a claim that is plausible on its face have been plead, (iii) the provisions of this Section 7.06(b)*

*have been complied with, (iv) the claim the holder desires to assert was not exculpated under the terms of the Plan, and (v) the holder is acting in good faith in pursuit of such claim.*

**(c) <u>Exculpation</u>.** *None of Exculpated Parties shall have or incur any liability whatsoever, in any form, to the Debtor, any holder of a Claim or Interest in the Debtor, or any other party in interest for any act or omission in connection with or arising out of the  Case, the involvement of any of them in the filing and/or conduct of the Case, including the type or value of distributions, if any, reserved under the Plan for holders of Claims or Interests, the pursuit of and consummation of the Wilson Sale, the solicitation of votes for acceptance or rejection of the Plan, the pursuit of confirmation and consummation of the Plan, the administration of the Plan or the property to be distributed under the Plan, other than acts or omissions found in a final judgment by a court of competent jurisdiction (not subject to further appeal) to constitute willful misconduct, gross negligence, or breach of fiduciary duty by such person or entity.*

BASEBALL PROTECTIVE, LLC F/K/A
EVOSHIELD, LLC

_____/s/ Sheron Moshell_____
By:  Sheron Moshell
Its:  Chief Liquidation Officer

LAMBERTH, CIFELLI, ELLIS & NASON, P.A.
Counsel for the Debtor

_____/s/ Gregory D. Ellis_____
Gregory D. Ellis, Esq.
Georgia Bar No. 245310

**EXHIBIT "A"**

# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF GEORGIA
### ATHENS DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| BASEBALL PROTECTIVE, LLC | ) | Bankruptcy Case No.: 16-31159 |
| f/k/a EvoShield, LLC, | ) | |
| | ) | |
| Debtor. | ) | |
| | ) | |


### CHAPTER 11 LIQUIDATION PLAN SUBMITTED BY:
### BASEBALL PROTECTIVE, LLC f/k/a EVOSHIELD, LLC
### DEBTOR AND DEBTOR IN POSSESSION


June 12, 2017


Filed by:


### BASEBALL PROTECTIVE, LLC f/k/a EVOSHIELD, LLC
Debtor and Debtor in Possession


Attorneys for Debtor:
Gregory D. Ellis
Georgia Bar No. 245310

LAMBERTH, CIFELLI
 ELLIS & NASON, P.A.

1117 Perimeter Center West
Suite W212
Atlanta, GA  30338
(404) 262-7373
(404) 262-9911 (facsimile)
gellis@lcenlaw.com

<u>INTRODUCTION</u>

Pursuant to Title 11 of the United States Code, Baseball Protective, LLC f/k/a EvoShield, LLC (the "Debtor"), Chapter 11 debtor and debtor in possession, submits and proposes this "Chapter 11 Liquidation Plan Submitted by Baseball Protective, LLC f/k/a EvoShield, LLC, Debtor and Debtor in Possession" (the "Plan").

ARTICLE I
<u>DEFINITIONS</u>

Unless the context requires otherwise, the following terms shall have the respective meanings specified below whenever used in the Plan. Capitalized terms not defined in this Plan have the meanings ascribed to such terms in Title 11 of the United States Code and the Federal Rules of Bankruptcy Procedure. Accounting terms not defined in the Plan shall have the meanings ascribed to such terms in accordance with generally accepted accounting principles currently in effect. Whenever from the context it appears appropriate, terms stated in the singular or plural shall include the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, the feminine, and the neuter.  The words "herein," "hereof," and "hereunder" and other words of similar import shall refer to this Plan as a whole, including any and all exhibits and schedules to the Plan, as the same may be amended.

"Administrative Claim" means a Claim for payment of an administrative expense of a kind specified in Section 503(b) of the Bankruptcy Code and referred to in Section 507(a)(1) of the Bankruptcy Code, including, without limitation: (a) the actual, necessary costs and expenses of preserving the estate and administering the Case that arose or accrued or that shall arise or accrue in the ordinary course of business during the period between the Petition Date and the Confirmation Date; (b) any Professional Fee Claim; and (c) any fee or charge assessed against the Debtor under 28 U.S.C. § 1930.

 "Allowed Administrative Claim" means all or that portion of an Administrative Claim to the extent it has been allowed by a Final Order of the Bankruptcy Court.

"Allowed Gap Period Claim" means all or that portion of a Gap Period Claim to the extent it has been allowed by a Final Order of the Bankruptcy Court.

"Allowed Claim and Allowed . . . Claim" means a Claim that is not a Disputed Claim and is allowed under the Plan and, therefore, is not subject to disallowance, defense, reduction, avoidance, setoff, or subordination of any kind. The term "Allowed" or "Allowed Claim" also means any Claim to the extent: (a) such Claim is scheduled by Debtor pursuant to the Bankruptcy Code and Bankruptcy Rules in a liquidated amount and not listed as contingent, unliquidated, zero, undetermined or disputed; or (b) a proof of such Claim was timely filed with the Bankruptcy Court pursuant to the Bankruptcy Code, the Bankruptcy Rules and/or any applicable Final Order, or late filed, but with leave of the Bankruptcy Court, deemed timely, and, in either case, (i) is not objected to within the period fixed by the Bankruptcy Code, the Bankruptcy Rules and/or applicable orders of the Bankruptcy Court or (ii) has otherwise been allowed by a Final Order or agreement of the Debtor.  An Allowed Claim includes a previously

Disputed Claim to the extent such Disputed Claim becomes Allowed when the context so requires.

"Avoidance Actions" means any claims, rights, defenses, or other causes of action arising under Chapter 5 of the Bankruptcy Code, including without limitation, Bankruptcy Code Sections 502, 510, 541, 542, 543, 544, 545, 547, 548, 549, 550, 551 and 553, or under similar state or federal statutes and common law, including state fraudulent transfer or preference laws, whether or not prosecution of such actions has commenced as of the Confirmation Date or the Effective Date.

"Bankruptcy Code" means Title 11 of the United States Code, as amended, as applicable to the Case.

"Bankruptcy Court" means the United States Bankruptcy Court for the Middle District of Georgia, Athens Division.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure and the local rules of the Bankruptcy Court, as applicable from time to time to the Case.

"Board Members" means Gordon Beckham, William Dore, Jr., James Ellis, Thomas Lamb and Graham Manley.

"Business Day" means any day, other than a Saturday, Sunday or a "legal holiday" (as such term is defined by Bankruptcy Rule 9006(a)).

"Case" means the Debtor's Chapter 11 bankruptcy case.

"Cash" means lawful currency of the United States and its equivalents, provided, however, that any distributions under this Plan will be deemed to be made in Cash if made by check drawn on any United States bank, or by wire transfer.

"Causes of Action" means any and all claims, rights, defenses, offsets, recoupments, actions in law or equity or otherwise, causes of action, choses in action, suits, damages, rights to legal or equitable remedies, judgments, third-party claims, counterclaims and cross-claims against any Entity or Person, whether arising under the Bankruptcy Code or federal, state, common, or other law, regardless of whether the subject of pending litigation or proceedings on the Confirmation Date, the Effective Date, or thereafter, including but not limited to: (a) all Avoidance Actions; (b) all other claims in avoidance, recovery, or subordination; and (c) all other actions described in the Disclosure Statement, any of the Schedules, or the Plan, including, without limitation, any claims against Dugout for lender liability or return of attorney fees, costs, and charges  as provided for under applicable law.

"Claim" means a claim, as defined in Section 101(5) of the Bankruptcy Code, against the Debtor.

"Claims Bar Date" means: (a) with respect to Claims arising from the rejection of an executory contract or unexpired lease (i) the date set in the order approving rejection of such executory contract or unexpired lease, or (ii) if the executory contract or unexpired lease is rejected under the Plan, the first Business Day that is thirty (30) days after the Effective Date; (b) with respect to Administrative Claims that accrued or were incurred during the period commencing after the Petition Date but prior to the Confirmation Date, the first Business Day that is thirty (30) days after the Effective Date or such other date set by the Court; (c) with respect to Priority Tax Claims, the first Business Day that is thirty (30) days after the Effective Date or such other date set by the Court; and (d) with respect to General Unsecured Claims, April 5, 2017, the date set forth in the Notice of Chapter 11 Bankruptcy Case (Doc No. 52) filed December 6, 2016.

"Class" means a class of Claims or Interests as defined in this Plan.

"Confirmation Date" means the date upon which the Bankruptcy Court enters the Confirmation Order.

"Confirmation Hearing" means the duly noticed hearing held by the Bankruptcy Court pursuant to Section 1128 of the Bankruptcy Code to consider confirmation of this Plan, as may be adjourned by the Court from time to time without further notice other than announcement of the adjourned date of the Confirmation Hearing at such hearing.

"Confirmation Order" means the order of the Bankruptcy Court confirming this Plan.

"Court" means the Bankruptcy Court or any other Court of the United States with authority over the Case or, with respect to any particular proceeding arising under or related to the Case, any other Court that is exercising jurisdiction over such proceeding.

"Creditor" means the Holder of a Claim against the Debtor.

"Debtor" means Baseball Protective, LLC f/k/a EvoShield, LLC.

"Designated Notice" means notice and an opportunity for a hearing as described in Section 102(1) of the Bankruptcy Code. Following entry of the Confirmation Order, the time for the giving of any notice shall be reduced to ten (10) days, and notice shall be limited to the Notice Parties. When a party gives Designated Notice and no written objection is served within ten (10) Business Days of service, the party to whom Designated Notice is given shall be presumed to have consented to or have no opposition to the relief or request identified in the Designated Notice. If a timely objection is served, the Court will hold a hearing on the objection on no less than five (5) days notice. Notwithstanding anything in this provision to the contrary, for twenty (20) days after the Confirmation Date, notice shall be provided to parties in interest entitled to notice pursuant to Bankruptcy Rule 2002(i) and Designated Notice shall not apply to any objection to a Claim.

"Disclosure Statement" means the Disclosure Statement filed with respect to this Plan, as approved by the Court and as may be further amended or modified.

3

"Disputed Claim or Disputed . . . Claim" means a Claim that (a) is not an Allowed Claim; (b) is not the subject of a Cause of Action or objection and that has not been allowed or disallowed by a Final Order; or (c) has been designated by the Debtor as a Disputed Claim.

"Distribution" means a distribution of Cash to a Claimant on account of an Allowed Claim pursuant to the terms of this Plan.

"Distribution Date" means any date on which distributions of Cash are to be made from the Distribution Fund.

"Distribution Fund" means the fund created and maintained in accordance with Section 4.06 of the Plan.

"Distribution Property" means all: (i) Cash on hand; (ii) Debtor's rights to any insurance or tax refunds; and (iii) any Tax Escrow Funds after payment of all Allowed Priority Tax Claims and fees and expenses of the Escrow Agent.

"Dugout" means Dugout Ventures, LLC.

"Effective Date" means the day that is the later of: (i) ten (10) Business Days after the Confirmation Date; or (ii) June 30, 2017.

"Equity Members" means the Holders of Interests in the Debtor.

"Exculpated Parties" means: (i) the Debtor; (ii) the Debtor's respective Professional Persons acting directly or indirectly in, relating to, or arising out of, their capacities as such; (iii) Sheron Moshell, Russ Allen, and Mike Van Alstyne acting directly or indirectly in, relating to, or arising out of, their capacities as an officer, employee, or agent of the Debtor; (iv) the Board Members acting directly or indirectly in, relating to, or arising out of, their capacities as member of the board or officers or directors of Debtor; and (v) Wilson.

"Final Decree" means a Final Order of the Bankruptcy Court closing the Case.

"Final Order" means an order or judgment of a Court (including one approving a settlement) entered on the docket which: (a) shall not have been reversed, stayed, modified or amended and as to which the time to appeal from, or to seek review or rehearing of, shall have expired and as to which no appeal or petition for review, rehearing or certiorari is pending; or (b) if appealed from, shall have been affirmed (or the appeal dismissed) and the time to appeal from such affirmance or to seek review or rehearing thereof shall have expired, or no further hearing, appeal or petition for certiorari can be taken or granted.

"Gap Period Claims" means all Claims arising in the ordinary course of the Debtor's business or financial affairs after the Petition Date but before entry of the Order for Relief.

"General Unsecured Claims" means all Claims against the Debtor arising on or before the Petition Date that are not Administrative Claims, Gap Period Claims, Priority Tax Claims, or Secured Claims. General Unsecured Claims include Insider Claims and any Claims of any Creditor asserting a Lien, to the extent the Lien of such Creditor exceeds the value of the property to which such Lien attached.

"Holder" means the beneficial owner of any Claim or Interest.

"Impaired" has the meaning ascribed to such term in Bankruptcy Code Section 1124.

"Interests" means any and all ownership rights and interests in the Debtor held by the Equity Members as of the Petition Date.

"Lien" means any mortgage, lien, pledge, charge, security interest, encumbrance or other legally cognizable security device of any kind affecting or attaching to such property of the estate.

"Notice Parties" means: (i) with respect to notices served by the Debtor:  the U.S. Trustee, the Board Members and all other parties in interest who, after entry of the Confirmation Order, have filed a request for notice with the Clerk of the Court and have served same on the Debtor's counsel; or (ii) with respect to notices served by a party other than the Debtor: the Debtor and its counsel, the U.S. Trustee, and all other parties in interest who, after entry of the Confirmation Order, have filed a request for notice with the Clerk of the Court and have served same on the Debtor's counsel.

"Operating Agreement" means the Fourth Amended and Restated Operating Agreement of Debtor dated as of October 17, 2014.

"Order for Relief" means the order of the Bankruptcy Court Granting Motion for Entry of Order for Relief entered in the Case on December 1, 2016.

"Petition Date" means October 31, 2016.

"Plan" means this plan proposed by the Proponent, as it may be amended or modified from time to time, including all exhibits and reports annexed hereto or referenced herein.

"Post-Confirmation Administrative Claims" means costs and expenses incurred, after the Confirmation Date, in connection with administration and consummation of this Plan, including, without limitation, Post-Confirmation Professional Fee Claims.

"Post-Confirmation Professional Fee Claims" means Post-Confirmation Administrative Claims for compensation earned, and reimbursement of expenses incurred, by attorneys, accountants, or other professionals employed by the Debtor.

"Priority Employee Claim" means a Claim that is entitled to priority under Section 507(a)(4) or (a)(5) of the Bankruptcy Code.

"Priority Tax Claim" means a Claim that is entitled to priority under Section 507(a)(8) of the Bankruptcy Code.

"Pro Rata Share" means, with respect to any distribution to a Class under this Plan, as of any particular Distribution Date, proportionate sharing pursuant to which the ratio of the cumulative amount of all funds distributed on account of an Allowed Claim to the amount of such Allowed Claim is the same as the ratio of the cumulative amount distributed to such Class to the total amount of all Allowed Claims and Disputed Claims classified into such Class.

"Professional Fee Claims" means Claims for compensation earned and reimbursement of expenses of attorneys, accountants, or other professionals employed by the Debtor, with approval of the Bankruptcy Court.

"Professional Persons" means attorneys, accountants, consultants, experts, financial advisors, investment bankers, and other professionals retained by Debtor in connection with the Case, the Wilson Sale, or in the implementation of the Plan.

"Proponent" means the Debtor.

"Sale Order" means that certain order entered in the Case as Docket No. 36 on November 16, 2016 authorizing the Debtor and Wilson to close the sale of assets pursuant to the terms of the Wilson APA.

"Secured Claim" means a Claim to the extent secured by a Lien on any property of any Debtor to the extent of the value of said property as provided in Section 506(a) of the Bankruptcy Code.

"Schedules" means the schedules of assets and liabilities and any amendments thereto filed by the Debtor in accordance with Section 521 of the Bankruptcy Code.

"Tax Escrow Funds" means the funds being held being held in escrow by Cohen Pollock Merlin & Small, P.C. as escrow agent pursuant to the Tax Escrow Agreement.

"Tax Escrow Agreement" means the tax escrow agreement between, Debtor, Wilson and Cohen Pollock Merlin & Small, P.C. made and entered into as of October 31, 2106 under which Wilson delivered as escrow agent the principal sum of Seven Hundred Eighty-two Thousand and 00/100 Dollars ($782,000.00).

"Tax Payment Agreement" means the Tax Payment Agreement between Debtor and Wilson executed pursuant to the terms of the Wilson APA filed as an exhibit to Docket No 8-6 Pages 21 through 24.

"Unclaimed Property" means any funds payable to Holders of Claims from the Distribution Fund that are unclaimed. Unclaimed Property shall include (a) checks (and the funds represented thereby) which have been returned as undeliverable without a proper forwarding address, (b) funds for checks which have not been presented and paid within ninety (90) days of their issuance, and (c) checks (and the funds represented thereby) which were not mailed or delivered because of the absence of a proper address to mail or deliver such property.

"Unimpaired" has the meaning ascribed to such term in Bankruptcy Code Section 1124.

"Unpaid Claims Reserve" means the reserve created pursuant to Section 5.02 of the Plan.

"U.S. Trustee" means the United States Trustee for Region 21, and the office of such United States Trustee.

"Wilson" means Wilson Sporting Goods Co..

"Wilson APA" means the Asset Purchase Agreement between Debtor and Wilson dated October 26, 2016 and all schedules and exhibits thereto.

"Wilson Sale" means that certain sale pursuant to the Asset Purchase Agreement between Debtor and Wilson dated October 26, 2016 as authorized by the Sale Order.


ARTICLE II
TREATMENT OF UNCLASSIFIED CLAIMS;
TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Pursuant to Section 1123 of the Bankruptcy Code, certain Claims are unclassified. Unclassified Claims are treated as follows:

2.01    Administrative Claims.  Allowed Administrative Claims are not classified in this Plan and are treated as follows:

(a)    Payment of Allowed Administrative Claims.  Holders of Allowed Administrative Claims other than Professional Fee Claims will be paid in full in cash as soon as practicable after the later of the Effective Date or the date such Claim becomes an Allowed Administrative Claim, unless otherwise agreed to by the Holder thereof. Other than quarterly United States Trustee's fees, which will be paid as they come due, and Professional Fee Claims, which may be filed at any time prior to entry of a Final Decree, any request for payment of an Administrative Claim arising on or before the Confirmation Date must be filed no later than the Claims Bar Date or such Administrative Claim will be forever barred. The Debtor shall have the right to object to the allowance of any Administrative Claim.

(b)    Payment of Professional Fee Claims. Professional Fee Claims with regard to the period prior to entry of the Confirmation Order shall be paid in the amount

7

awarded pursuant to orders of the Bankruptcy Court and shall be paid in full in Cash as soon as practicable after the later of the Effective Date or the date such Claim becomes an Allowed Administrative Claim, unless otherwise agreed to by the Holder thereof.

2.02    Priority Tax Claims and Priority Employee Claims. Holders of Priority Tax Claims  and Priority Employee Claims shall be paid the full amount of their Allowed Claims (with legal interest) on the date that is no later than ninety (90) days after the Effective Date or thirty (30) days after such Claim becomes an Allowed Priority Tax Claim or Allowed Employee Priority Claim.

2.03    Treatment of Other Certain Unclassified Claims. Other unclassified Claims are treated as follows:

(a)    Post-Confirmation Administrative Claims. Post-Confirmation Administrative Claims, other than Post-Confirmation Professional Fee Claims, shall be paid as the same come due, without the necessity of Bankruptcy Court approval. Upon motion of any party in interest, the Bankruptcy Court may review any payment of such Post-Confirmation Administrative Claims and, if appropriate, order the return or refund of any such payment. Post-Confirmation Professional Fee Claims shall be subject to review by the Notice Parties. A party seeking payment of a Post-Confirmation Professional Fee Claim shall serve its invoice on the Notice Parties. Unless one or more of the Notice Parties files an objection with the Bankruptcy Court within twenty (20) days of the receipt of the invoice, the Debtor shall be fully authorized without an order of the Bankruptcy Court to pay, on a monthly basis, one hundred percent (100%) of the fees and one hundred percent (100%) of the expenses incurred.  If an objection is filed, then the Debtor shall still be fully authorized without an order of the Bankruptcy Court to pay, on a monthly basis, one hundred percent (100%) of the fees and one hundred percent (100%) of the expenses incurred that are not the subject to an objection. The Bankruptcy Court shall retain jurisdiction over any objections to such fees and expenses that are filed and shall be authorized to determine whether to allow any disputed Post-Confirmation Professional Fee Claims following a hearing on no less than ten (10) days notice to the parties to the dispute.

(b)    Fees of U.S. Trustee.  Any pre-confirmation fees due to the United States Trustee pursuant to 28 U.S.C. § 1930(a)(6) shall be paid within ten (10) business days after the Confirmation Date or upon their due date, whichever is later. Post-confirmation fees due the United States Trustee shall be paid on the date that such fees are due.

(c)    Ad Valorem Tax Claims.  All ad valorem tax claims shall be paid in full on or before their due date.

2.04    Treatment of Executory Contracts and Unexpired Leases. Subject to the requirements of Section 365 of the Bankruptcy Code, all executory contracts and unexpired

leases which have not been previously rejected by order of the Court or otherwise expressly assumed by the Plan shall be rejected on the Effective Date.

2.05    Assumption of Insurance Policies; Assignment of Rights. Each of the Debtor's insurance policies and any agreements, documents or instruments relating thereto (the "Insurance Policies"), unless previously cancelled, shall be treated as executory contracts under the Plan, and the Plan shall constitute a motion to assume the Insurance Policies. Subject to the occurrence of the Effective Date, the entry of the Confirmation Order by the Clerk of the Bankruptcy Court shall constitute approval of such assumption pursuant to Bankruptcy Code Sections 365(a) and 1123(b)(2) and a finding by the Bankruptcy Court that such assumption is in the best interests of the Debtor and all parties in interest in the Chapter 11 Case. Unless otherwise determined by the Bankruptcy Court pursuant to a Final Order or agreed by the parties thereto prior to the Effective Date, no payments are required to cure any defaults of Debtor existing as of the Confirmation Date. To the extent the Bankruptcy Court or Debtor determines otherwise as to any of the Insurance Policies, Debtor reserves the right to seek rejection of such Insurance Policy or other available relief.


ARTICLE III
CLASSIFICATION AND TREATMENT
OF CLAIMS AND INTERESTS; IMPAIRMENT

Claims and Interests are treated as set forth below.  A Claim or Interest shall be deemed classified in a particular Class only to the extent that (a) the Claim or Interest is included within the description of that Class, and (b) the Claim or Interest is not included in any other Class.  To the extent that any portion or remainder of the Claim or Interest qualifies within the description of a different Class, that portion of the Claim or Interest shall be classified in that different Class. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been satisfied, disallowed or extinguished before the Effective Date of the Plan.

3.01    Class 1 (General Unsecured Claims). Class 1 shall consist of all Allowed General Unsecured Claims. Creditors holding Allowed General Unsecured Claims shall receive, in full satisfaction, release and discharge of and in exchange for such Claims, their Pro Rata Share of any Cash Distribution from the Debtor to Holders of Allowed Unsecured Claims. The timing and nature of the Distributions to be made to the Holders of Allowed Unsecured Claims shall be governed by Article 5 of this Plan.

3.02    Class 2 (Interests). Class 2 consists of the Holders of Interests. On the Effective Date, while all Interests in the Debtor shall be retained, the Holders of Class 3 Interests shall receive no property of any value under the Plan.

3.03    Impairment. The Holders of Claims in Class 1 are Impaired under the Plan and are eligible to vote on the Plan.  The Holders of Interests in Class 2 are Impaired and will not receive or retain any property under the Plan, and, pursuant to Section 1126(g) of the Bankruptcy

Code, are deemed to reject the Plan, and, therefore, are not entitled to vote to accept or to reject the Plan.

## ARTICLE IV
## MEANS FOR EXECUTION OF THE PLAN

4.01    Funding of the Plan. Funds for Distributions to creditors shall come from the Distribution Property.

4.02    Management. The Debtor shall effect the consummation of the Plan. The Debtor shall be responsible for: (i) maintenance of the Distribution Fund; and (ii) Distributions of Cash from the Distribution Fund.

4.03    Authorizations. The entry of the Confirmation Order shall constitute authorization of the Debtor to take or cause to be taken any action necessary or appropriate to consummate the provisions of this Plan, and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court. All matters provided for under the Plan involving the structure of the Debtor in connection with the Plan, and any action required by the Debtor in connection with the Plan, shall be deemed to have occurred and shall be in effect. The Debtor shall be authorized to execute documents as may be necessary to effectuate the provisions of this Plan.

4.04    Objections to Claims.  Only the Debtor may file objections to Claims (whether filed, scheduled, or otherwise considered). All objections shall be resolved by the Bankruptcy Court unless settled as provided herein. Any objection to a Claim may be settled after the settling parties provide Designated Notice of the proposed settlement and there are no timely objections, and such Claim shall become an Allowed Claim without (i) further notice to any parties, and (ii) without the approval of the Bankruptcy Court. In the event of an objection, the Bankruptcy Court shall resolve the objection after notice and hearing.

4.05    Setoff Rights.  The Debtor may, but shall not be required to, setoff against any Claim, and against any Distributions to be made pursuant to the Plan in respect of such Claim, any claims of any nature whatsoever which the Debtor may have against the Holder of such Allowed Claim, but neither the failure to do so nor the allowance of any Allowed Claim hereunder shall constitute a waiver or release of any such claim the Debtor may have against such Holder.  Nothing herein shall be construed to extend any statute of limitations provided by applicable law or to prevent the Debtor from filing an action.

4.06    Establishment of Distribution Fund.  Debtor shall either maintain its existing debtor-in-possession account or establish one or more segregated accounts to be known and designated as the Distribution Fund consisting of the Distribution Property. The funds in the Distribution Fund shall be held for the sole and exclusive benefit of those parties entitled to Distributions therefrom. The Distribution Fund may from time to time be invested in short term certificates of deposit, short term treasury bills, or money market accounts. All interest earned shall be retained in the Distribution Fund. The Debtor shall be authorized to open such bank or

10

other depository account or accounts as may be necessary or appropriate to carry out the provisions of the Plan.

4.07    Employment of Professionals. The Debtor may employ the professionals employed by the Debtor prior to the Confirmation Date. The Debtor shall be entitled to employ such additional professionals as may be necessary after the Confirmation Date.

4.08    Dissolution of the Debtor. Following (i) entry of a Final Decree and (ii) completion of all Distributions from the Distribution Fund, the Debtor shall take such steps as are necessary to effect dissolution of the Debtor under Delaware law. The Debtor shall be authorized to reserve from the final Distribution such amounts reasonably necessary to pay Post-Confirmation Administrative Claims and Post-Confirmation Professional Fees associated with such dissolution.  In the event the Debtor does not dissolve as contemplated hereby, the Debtor shall be authorized to amend its charter in accordance with Section 1123(a)(6) of the Bankruptcy Code.

4.09    Records Retention and Destruction Procedures.   The Debtor shall have no obligation to make expenditures or incur liability to preserve records. In no event shall Debtor have any obligation to preserve copies of any documents or electronically-stored information (ESI) that were transferred to Wilson. Any party in interest may file a notice and request for records preservation within 60 days of the Effective Date. Any such records preservation notice shall include an undertaking that the requesting party will pay the costs to preserve any requested records.  The Debtor shall be entitled to cause the destruction of any and all records (including ESI) after 60 days from the Effective Date if such records are not subject to a record preservation notice.

ARTICLE V
DISTRIBUTIONS

5.01    Distributions.

(a)    Distribution Fund. Funds in the Distribution Fund shall be used to pay the following items in the priority indicated:

(1)    First, to pay all unpaid Allowed Administrative Claims in full;

(2)    Second, to pay all unpaid Allowed Gap Period Claims in full;

(3)    Third, to pay all unpaid Employee Priority Claims in full;

(4)    Fourth, to pay all Allowed Priority Tax Claims in full;

(4)    Fifth, to pay the Holders of General Unsecured Claims their Allowed Claims;

(5)     Sixth, and only if General Unsecured Claims are paid 100% of their Allowed Claims, to pay the Holders of General Unsecured Claims interest on their Allowed Claims at a rate of 6% accruing from the Effective Date until paid; and

(6)     Seventh, and only if all Allowed General Unsecured Claims are paid in full with interest accruing from and after the Effective Date until paid, Equity Members based upon their percentage right to distributions resulting from their Interests as determined by the Operating Agreement of the Debtor as of the Petition Date.

(b)     In the event the Debtor makes a Distribution to the Holders of Allowed Claims in a Class of less than the full amount of the Allowed Claims in the Class, the Holders of Allowed Claims in the Class entitled to participate in the Distribution shall receive a Pro Rata Share of such Distribution.

5.02   Unclaimed Property.  Unclaimed Property is treated as follows:

(a)     Unclaimed Property shall be deposited in the Unpaid Claims Reserve to be held in trust for the benefit of the Holders of Allowed Claims entitled thereto under the terms of the Plan.  For a period of six (6) months following the first Distribution or ninety (90) days after a Distribution is made to a Creditor on account of which Unclaimed Property first results (said period being hereinafter referred to as the "Claiming Period"), Unclaimed Property shall be held in the Unpaid Claims Reserve solely for the benefit of the Holders of Allowed Claims which have failed to claim such property. During the Claiming Period, Unclaimed Property due the Holder of an Allowed Claim shall be released from the Unpaid Claims Reserve and delivered to such Holder upon presentation of proper proof by such Holder of its entitlement thereto. In the event that there is Unclaimed Property in the Unpaid Claims Reserve with regard to any Claim, the Debtor shall, until such Unclaimed Property is claimed or the Claiming Period with regard to the Holder of such Claim has expired, make all subsequent Distributions due with regard to such Claim to the Unpaid Claims Reserve.  After the Claiming Period with regard to such Holder has expired, no subsequent Distributions shall be made on account of such Claim, and such Claim shall be treated as being disallowed, waived, and satisfied.

(b)     At the end of the Claiming Period, the Holder of an Allowed Claim theretofore entitled to Unclaimed Property shall cease to be entitled thereto, and the Unclaimed Property shall then be disbursed to the Distribution Fund for Distributions as set forth above.

(c)     The Unpaid Claims Reserve may be maintained in an interest bearing account. No Holder entitled to funds from the Unpaid Claims Reserve shall be entitled to interest with regard to the amounts due.

5.03    Supervision of Administration of Case and Distribution of Funds.  Maintenance and distribution of all amounts under the Plan and administration of the Case shall be subject to supervision of the Bankruptcy Court on application of any interested party.

5.04    Reserves.  In the event that an objection to a Claim is pending or the Debtor has designated a Claim as a Disputed Claim so that the Claim is a Disputed Claim, the Debtor shall not make any Distributions on account of such Claim until the Claim is an Allowed Claim.  With respect to General Unsecured Claims the Debtor shall reserve Cash for any Distribution that would have been made on account of the Claim has the Claim been an Allowed Claim. In addition to reserving for Disputed Claim, the Debtor shall establish a reasonable reserve to pay any unpaid Administrative Claims and Gap Period Claims. The Debtor shall also establish a reasonable reserve for Post-Confirmation Administrative Claims.  With respect to Priority Tax Claims the Debtor shall establish a reasonable reserve taking into account the Tax Escrow Funds in such amount as is agreed to by Debtor and Wilson; in the event the Debtor and Wilson cannot agree on an amount, the amount of the reserve shall be determined by the Court.  All Cash or other property allocable to the relevant reserve hereunder with respect to Disputed Claims shall be allocated for record keeping purposes only (and not as a separate or distinct fund or account and without interest), to the Disputed Claims Reserve with respect to the Initial Claims Distribution Date (or such other date on which distributions for any particular Class of Claims are made pursuant to the Plan). Once a Disputed Claim becomes an Allowed Claim, the Debtor shall pay on account of such Allowed Claim all Distributions to which such Allowed Claim would have been entitled had the Claim been an Allowed Claim when such Distributions were payable except for Priority Tax Claims which shall be paid pursuant to the terms of the Tax Escrow Agreement as modified by the Plan.

5.05    Distribution from Tax Escrow Funds.   Distributions from the Tax Escrow Funds shall be made to pay Allowed Priority Tax Claims and expenses of Cohen   Pollock   Merlin   & Small, P.C. as escrow agent pursuant to the Tax Escrow Agreement pursuant to the terms of the Tax Payment Agreement and Tax Escrow Agreement; provided, however, that in the event Wilson does not consent to a Distribution to pay an Allowed Priority Tax Claim the Debtor shall have the right to request the Bankruptcy Court to authorize such Distribution from the Tax Escrow Funds after Designated Notice to Wilson.

ARTICLE VI
EFFECT OF CONFIRMATION; VESTING OF PROPERTY; DISCHARGE

6.01    Effect of Confirmation; Vesting of Property; Continuation of Stay. Except as otherwise provided in the Plan or in the Confirmation Order, this Plan upon entry of the Confirmation Order shall be binding on all parties in interest, regardless of whether the Claims or Interests are impaired and regardless of whether the Holders have accepted the Plan. All of the property of the estate shall vest with the Debtor on the Effective Date free and clear of Liens, except as specifically provided herein.

13

6.02   <u>Discharge</u>.   Pursuant to Section 1141(d)(1) of the Bankruptcy Code, the Debtor shall not receive a discharge upon entry of the Confirmation Order confirming the Plan.

6.03   <u>Retention of Estate Causes of Action/Reservation of Rights</u>. The Debtor shall have, retain, reserve and be entitled to assert, prosecute, settle, or abandon, any and all Causes of Action.

6.04   <u>Preservation of Insurance</u>. Notwithstanding any contrary provision in the Plan or Confirmation Order, the Plan shall not diminish or impair the enforceability of Insurance Policies that may cover Claims against Debtor, its Estate, or its Assets or any other Person or Entity and all rights of the Debtor and any covered person under Insurance Policies are reserved.  Nothing contained in the Plan, or Confirmation Order shall be construed to alter any existing obligation of Debtor to indemnify, to the extent necessary to insure, any person or entity, including without limitation, any officers and/or directors of Debtor, entitled to indemnification pursuant to any Insurance Policies under applicable law.

6.05   <u>Term of Injunctions or Stays</u>. Until the Effective Date, all injunctions or stays provided for in the Chapter 11 Case under Bankruptcy Code Sections 105(a) or 362, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect. After the Effective Date, all injunctions or stays provided for in the Chapter 11 Case under Bankruptcy Code Sections 105(a) or 362, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the final Distribution Date or the Debtor's Chapter 11 Case is closed.

**6.06   <u>Permanent Injunction.</u>**

**(a)      <u>Terms of Injunction</u>.   *Except as otherwise expressly provided in the Plan, or the Confirmation Order, all Persons who have held, hold or may hold Claims against, or Equity in, the Debtor are permanently enjoined, on and after the Effective Date, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, from taking any of the following actions against the Exculpated Parties on account of, in connection with, or related to, in any manner whatsoever, whether directly or indirectly, such Claims or Interests:  (a) commencing or continuing in any manner any action or other proceeding of any kind; (b) the enforcement, attachment, collection, or recovery by any manner or means of judgment, award, decree or order; (c) creating, perfecting, or enforcing any encumbrance of any kind; (d) asserting any right of setoff, recoupment or subrogation of any kind; and (e) commencing or continuing in any manner or in any place any suit, action or other proceeding that does not comply with or is inconsistent with the provisions of the Plan.  The foregoing injunction will extend to successors of the Exculpated Parties.***

**(b)      <u>Relief from Injunction</u>.   *Any Person asserting a claim against one or more of the Exculpated Parties that is enjoined under Section 7.06(a) of the Plan and that is not otherwise exculpated under the Plan may seek relief from the injunction contained in Section 7.06(a) of the Plan by filing with the Bankruptcy Court an explanation of the claim against the, a description of the action(s) the holder desires to take on account of such claim and by***

14

*thereafter obtaining an order of the Bankruptcy Court allowing the holder to assert the claim. The Bankruptcy Court shall enter such order upon the finding that (i) the claim is for gross negligence, willful misconduct, or breach of fiduciary duty, (ii) verified facts sufficient to state a claim that is plausible on its face have been plead, (iii) the provisions of this Section 7.06(b) have been complied with, (iv) the claim the holder desires to assert was not exculpated under the terms of the Plan, and (v) the holder is acting in good faith in pursuit of such claim.*

       **6.07**   **Exculpation.** *None of Exculpated Parties shall have or incur any liability whatsoever, in any form, to the Debtor, any holder of a Claim or Interest in the Debtor, or any other party in interest for any act or omission in connection with or arising out of the Case, the involvement of any of them in the filing and/or conduct of the Case, including the type or value of distributions, if any, reserved under the Plan for holders of Claims or Interests, the pursuit of and consummation of the Wilson Sale, the solicitation of votes for acceptance or rejection of the Plan, the pursuit of confirmation and consummation of the Plan, the administration of the Plan or the property to be distributed under the Plan, other than acts or omissions found in a final judgment by a court of competent jurisdiction (not subject to further appeal) to constitute willful misconduct, gross negligence, or breach of fiduciary duty by such person or entity.*

<div align="center">

ARTICLE VII
RETENTION OF JURISDICTION

</div>

       7.01   <u>Jurisdiction</u>. Notwithstanding confirmation of this Plan or the Effective Date having occurred, the Bankruptcy Court shall retain jurisdiction for the following purposes:

      (a)      The determination of the allowability of Claims upon objection to such Claims by any party;

      (b)      Determination of any objections to requests for payment of Administrative Claims or Gap Period Claims, including Professional Fee Claims;

      (c)      Adjudication of any actions brought by or against the Debtor in the Bankruptcy Court before confirmation of the Plan;

      (d)      Resolution of controversies and disputes regarding the interpretation and implementation of this Plan, including the determination of defaults under the Plan;

      (e)      Implementation of the provisions of this Plan and entry of orders in aid of confirmation of this Plan; and

      (f)      Determination of any tax liabilities pursuant to Section 505 of the Bankruptcy Code.

       7.02   <u>Other Jurisdiction</u>. In the event that the Bankruptcy Court is found to lack jurisdiction to resolve any matter, then such matter shall be heard and determined by the District

<div align="center">15</div>

Court for the Northern District of Georgia (the "District Court"). If the District Court does not have jurisdiction, then the matter may be brought before any Court having jurisdiction with regard thereto.

   7.03 <u>Closing of Case</u>. The Bankruptcy Court may, upon application of the Debtor after Designated Notice, determine that this Plan has been substantially consummated within 120 days after the Confirmation Date, notwithstanding the fact that additional funds may eventually be distributed. In such event, the Bankruptcy Court may enter an order closing this case pursuant to Section 350 of the Bankruptcy Code, provided, however, that: (a) the Debtor shall continue to have the rights, powers, and duties set forth in this Plan; and (b) the Bankruptcy Court may from time to time reopen the case if appropriate for the purpose of enforcing provisions of the Plan or supervising its implementation, or for other cause.

<div align="center">

ARTICLE VII
<u>GENERAL PROVISIONS</u>

</div>

   8.01 <u>Modification of Plan</u>. This Plan may be modified pursuant to Section 1127 of the Bankruptcy Code and as herein provided, to the extent permitted by applicable law. The Plan may be modified, before or after confirmation, without notice or hearing, or on such notice and hearing as the Bankruptcy Court deems appropriate, if the Bankruptcy Court finds that the modification does not materially and adversely affect the rights of any parties which have not had notice and an opportunity to be heard with regard thereto. Without limiting the generality of the foregoing, the Plan may be modified after notice and hearing to an entity that requested notice pursuant to Bankruptcy Rule 2002(i). In the event of any modification on or before confirmation, any votes to accept or reject the Plan shall be deemed to be votes to accept or reject the Plan as modified, unless the Bankruptcy Court finds that the modification materially and adversely affects the rights of parties which have cast said votes.

   8.02 <u>Severability</u>. If any provision in this Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of this Plan.

   8.03 <u>Binding Effect</u>. The rights, duties and obligations of any entity named or referred to in this Plan shall be binding upon, and shall insure to the benefit of, the successors and assigns of such entity.

   8.04 <u>Headings</u>. The heading of the Articles and Sections of this Plan have been used for convenience only and shall not limit or otherwise affect the meaning thereof.

   8.05 <u>Applicable Law</u>. Except to the extent that the Bankruptcy Code or the Bankruptcy Rules are applicable, the rights and obligations arising under this Plan shall be governed by the laws of the State of Georgia.

   8.06 <u>Revocation of Plan</u>. The Proponent reserves the right, unilaterally and unconditionally, to revoke and/or withdraw the Plan at any time prior to entry of the

<div align="center">16</div>

Confirmation Order, and upon such revocation and/or withdrawal the Plan shall be deemed null and void and of no force and effect.

8.07   <u>Supremacy Clause</u>.   In the event of any conflict between any Disclosure Statement and the Plan, the terms of the Plan shall control.

<div align="center">

ARTICLE IX
<u>REQUEST FOR CONFIRMATION PURSUANT TO SECTION 1129(b)</u>

</div>

In the event that all requirements for confirmation are met except the provisions of Section 1129(a)(8) of the Bankruptcy Code, the Debtor requests that the Plan be confirmed pursuant to Section 1129(b) of the Bankruptcy Code.

Dated this 12th day of June 2017.

<div style="margin-left: 40%;">

LAMBERTH, CIFELLI, STOKES,
ELLIS & NASON, P.A.
Attorneys for the Debtor


By:____/s/ Gregory D. Ellis_____
    Gregory D. Ellis
    Georgia Bar No. 245310

</div>

**EXHIBIT "B"**

| Vendor | Document | Vendor Name | Payment Type | Document Date | Document Total | | Purpose |
|--------|----------|-------------|--------------|---------------|----------------|---|---------|
| 9001005 | 4091 | A-1 Fire Extinguisher, Inc. | Check | 11/11/2016 | $ | 120.00 | Inspection |
| 9000263 | 4090 | Ackerman Security System | Check | 11/11/2016 | $ | 137.85 | Alarm System |
| 9000225 | 4082 | Agence Sportive SP Inc | Check | 11/11/2016 | $ | 93.94 | Commissions |
| 9001008 | 4127 | Air Tiger Express, Inc. | Check | 11/22/2016 | $ | 3,613.60 | Freight |
| 9000224 | 4081 | Archibald Team Sales Inc | Check | 11/11/2016 | $ | 239.37 | Commissions |
| 9001039 | 4092 | Athens Material Handling | Check | 11/11/2016 | $ | 488.51 | Forklift repairs |
| 9000264 | 4130 | Athens Reddy Urgent Care | Check | 11/22/2016 | $ | 20.00 | Drug Testing from May |
| 9000192 | 4104 | Avalara | Check | 11/11/2016 | $ | 126.00 | Sales Tax Reporting Fee |
| 9000192 | 4119 | Avalara | Transfer | 11/15/2016 | $ | 1,131.07 | Oct Sales Tax Processing Fee |
| 9000249 | 4125 | Blanton Investments, LLC | Check | 11/21/2016 | $ | 7,300.00 | Nov Rent |
| 9001068 | 4093 | Bug House Pest Control | Check | 11/11/2016 | $ | 250.00 | Service at warehouse |
| 9000048 | 4117 | Chris Bostick | Check | 11/15/2016 | $ | 1,500.00 | Player endorsement |
| 9000180 | 4078 | Christian Yelich | Check | 11/11/2016 | $ | 1,000.00 | Player endorsement |
| 9001095 | 4048 | Cohen Pollock Merlin Small, PC | Transfer | 11/2/2016 | $ | 40,851.25 | Legal |
| 9001095 | 4138 | Cohen Pollock Merlin Small, PC | Transfer | 11/23/2016 | $ | 34,775.99 | Legal |
| 9001095 | 4140 | Cohen Pollock Merlin Small, PC | Transfer | 11/23/2016 | $ | 80,196.75 | Legal |
| 9000019 | 4110 | Dell Financial Services | Transfer | 11/14/2016 | $ | 5,636.22 | Loan payoff prior to Wilson purchase |
| 9000184 | 4053 | DHL eCommerce | Check | 11/3/2016 | $ | 3,747.47 | Freight |
| 9001130 | 4094 | ECS (Effective Computer Solutions, Inc.) | Check | 11/11/2016 | $ | 112.50 | SAP Software Support |
| 9001130 | 4109 | ECS (Effective Computer Solutions, Inc.) | Check | 11/14/2016 | $ | 225.00 | SAP Software Support |
| 9001131 | 4095 | El Gordo, LLC | Check | 11/11/2016 | $ | 291.00 | Replacement check |
| 9000285 | 4057 | Endicia Fees | Transfer | 11/3/2016 | $ | 34.95 | Internet Shipping Software |
| 9001149 | 4105 | Federal Express | Check | 11/11/2016 | $ | 1,177.26 | Freight |
| 9000169 | 4077 | FlexCare | Check | 11/11/2016 | $ | 77.00 | Flexcare for Oct |
| 9000235 | 4088 | Gallant Industries Co.,LTD | Check | 11/11/2016 | $ | 297.99 | Commissions |
| 9000253 | 4089 | Gary Sanchez | Check | 11/11/2016 | $ | 1,000.00 | Player endorsement |
| 9000228 | 4085 | Gauch Sports Marketing | Check | 11/11/2016 | $ | 73.00 | Commissions |

498856

| Vendor | Document | Vendor Name | Payment Type | Document Date | Document Total | Purpose |
|---|---|---|---|---|---|---|
| 9001170 | 4096 | Georgia Natural Gas | Check | 11/11/2016 | $ 386.09 | Utilities |
| 9001173 | 4112 | Georgia United Credit Union | Check | 11/14/2016 | $ 20,911.60 | Payoff Vehicles |
| 9001177 | 4049 | Google Inc. | Transfer | 11/2/2016 | $ 500.00 | Internet Ads |
| 9001177 | 4066 | Google Inc. | Transfer | 11/7/2016 | $ 500.00 | Internet Ads |
| 9001177 | 4068 | Google Inc. | Transfer | 11/7/2016 | $ 56.50 | Email acct |
| 9001177 | 4070 | Google Inc. | Transfer | 11/9/2016 | $ 500.00 | Internet Add |
| 9001177 | 4097 | Google Inc. | Check | 11/11/2016 | $ 385.80 | Email acct |
| 9000231 | 4087 | Greg Hanson Sales Ltd | Check | 11/11/2016 | $ 486.11 | Commissions |
| 9001190 | 4059 | Hardie Jackson | Check | 11/4/2016 | $ 26.88 | Expense Reimbursement |
| 9000087 | 4060 | Hire Dynamics, LLC | Check | 11/4/2016 | $ 1,738.08 | Warehouse help |
| 9001205 | 4124 | Idol & Assoc. LLC | Check | 11/16/2016 | $ 1,889.50 | 2015 Tax Return |
| 9000227 | 4084 | J.G.S. Sportswear Sales | Check | 11/11/2016 | $ 358.75 | Commissions |
| 9000104 | 4115 | James M Van Alstyne | Transfer | 11/14/2016 | $ 1,489.87 | Travel reimbursement |
| 9001250 | 4128 | Kendall Carroll | Check | 11/22/2016 | $ 1,500.00 | Sales Analytical services |
| 9000298 | 4050 | Lamberth, Cifelli, Ellis, Nason, P.A. | Transfer | 11/3/2016 | $ 10,000.00 | Retainer |
| 9000298 | 4069 | Lamberth, Cifelli, Ellis, Nason, P.A. | Transfer | 11/9/2016 | $ 25,000.00 | Retainer |
| 9000298 | 4141 | Lamberth, Cifelli, Ellis, Nason, P.A. | Transfer | 11/23/2016 | $ 103,413.50 | Legal fee - bankruptcy |
| 9000270 | 4056 | MailChimp | Transfer | 11/3/2016 | $ 337.50 | Advertising Internet exp |
| 9000096 | 4073 | Marcus Wilson | Check | 11/11/2016 | $ 500.00 | Player endorsement |
| 9000277 | 4116 | Microsoft Online, Inc | Transfer | 11/14/2016 | $ 399.76 | Bing Ads Internet exp |
| 9000230 | 4086 | Mike Stanford | Check | 11/11/2016 | $ 189.63 | Commissions |
| 9000132 | 4054 | Neil Wensley | Transfer | 11/3/2016 | $ 1,661.46 | Travel reimbursement |
| 9001312 | 4126 | Neopost | Transfer | 11/21/2016 | $ 81.94 | Postage |
| 9000115 | 4074 | NOCSAE | Check | 11/11/2016 | $ 162.94 | Royalties |
| 9001320 | 4120 | Novatime | Transfer | 11/15/2016 | $ 155.00 | Time clock |
| 9001325 | 4099 | Oconee Co. Utility Dept | Check | 11/11/2016 | $ 139.21 | Utilities-Water |
| 9001326 | 4100 | Oconee Waste Transport, Inc. | Check | 11/11/2016 | $ 186.94 | Utilities-garbage pickup |
| 9001361 | 4101 | Quill Corp. | Check | 11/11/2016 | $ 390.48 | Office supplies |

498856

| Vendor | Document | Vendor Name | Payment Type | Document Date | Document Total | Purpose |
|---|---|---|---|---|---|---|
| 9000013 | 4113 | Regions Insurance Inc. | Check | 11/14/2016 | $ 15,940.48 | Liability Insurance Renewal - 3 month policy |
| 9001377 | 4102 | RICOH USA Inc. | Check | 11/11/2016 | $ 512.10 | Copier |
| 9001385 | 4122 | Russ Allen | Check | 11/16/2016 | $ 415.71 | Expense Reimbursement |
| 9000123 | 4075 | Safety Equipment Institute | Check | 11/11/2016 | $ 545.00 | Helmet Certification Fees |
| 9001402 | 4061 | Sheron Moshell | Check | 11/4/2016 | $ 2,673.00 | Reimbursement for Zendesk |
| 9001402 | 4103 | Sheron Moshell | Check | 11/11/2016 | $ 83.16 | Expense Reimbursement |
| 9001416 | 4107 | SPS Commerce, Inc. | Check | 11/11/2016 | $ 752.90 | Nov EDI Fees |
| 9001416 | 4108 | SPS Commerce, Inc. | Check | 11/11/2016 | $ 483.91 | Nov EDI Fees |
| 9000226 | 4083 | TC Sports Marketing Inc | Check | 11/11/2016 | $ 87.11 | Commissions |
| 9001462 | 4052 | United Healthcare | Check | 11/3/2016 | $ 11,855.55 | Nov Health Ins |
| 9000161 | 4051 | Unum Life Insurance Co. | Check | 11/3/2016 | $ 2,046.99 | Life/Disability Ins |
| 9000161 | 4123 | Unum Life Insurance Co. | Check | 11/16/2016 | $ 335.88 | Final Life/Disability Ins |
| 9001466 | 4071 | UPS | Transfer | 11/10/2016 | $ 1,372.78 | Freight |
| 9000279 | 4046 | Vast Conference | Transfer | 11/1/2016 | $ 45.79 | Conference Calls Exp |
| 9000163 | 4129 | Vision Service Plan | Transfer | 11/22/2016 | $ 435.79 | Final Vision Insurance |
| 9000185 | 4058 | Webscale Networks, Inc | Check | 11/4/2016 | $ 1,500.00 | Internet expense Oct |
| 9000127 | 4076 | Windstream Corporation | Check | 11/11/2016 | $ 663.30 | Phone bill |
| | | | | | $ 397,613.71 | |

498856